Argued September 27, modified November 23, 1915, rehearing denied February 15, 1916.

## BARNES v. SPENCER.

(153 Pac. 47.)

**Trusts—Rights of Creditors Obtained by Levy Under Execution—Fraud.**

1. Section 233, subdivision 4, L. O. L., declares that an execution is levied in the same manner and with like effect as similar property is attached. Section 301, L. O. L., provides that from the date of an attachment until it is discharged, the plaintiff, as against third persons, shall be deemed a *bona fide* purchaser, in good faith and for value, of the property attached. *Held* that an attaching creditor of the husband who caused an execution to be levied on land, the record title of which was in the name of the husband, in order to defeat an outstanding equity of plaintiff in the property by reason of her furnishing the purchase money, must allege and prove the character of his ownership and that his claim is founded upon a valuable consideration.

> [As to interest in trust estate as reachable by creditor's bill, see note in Ann. Cas. 1914B, 950.]

**Judgment—Res Judicata—When Estoppel does not Apply.**

2. Plaintiff is not precluded, by a judgment obtained by one of the defendants against her husband, to assert rights in property where her rights were acquired before rendition of the judgment, and to show that the creditor had taken an unfair advantage of the debtor.

**Trusts—Enjoining Sheriff's Sale Under Execution—Evidence.**

3. In a suit by a wife as the beneficiary of a resulting trust to enjoin the sheriff from selling under execution sale certain land levied on as the property of her husband, evidence examined and *held* to show that the claim made by the creditor was not such as would constitute him a *bonâ fide* purchaser for value under Section 233, subdivision 4, L. O. L., and Section 301.

**Trusts—Creation of a Resulting Trust.**

4. It is the rule that a beneficial estate follows the consideration, and attaches to the party furnishing such consideration, and therefore plaintiff, who provided the funds for her husband to purchase the property, is the real owner of the property so purchased.

**Trusts—Property not Subject to Debts of Trustee.**

5. As a general rule, trust property is not liable for the debts of a trustee, and cannot be reached by attachment or execution, although any beneficial interest the trustee may have in the property may be so reached, and a resulting trust is within the operation of the rule announced. The lien of a judgment is only a charge upon the actual interest which the judgment debtor has in the property, and upon no other.

**Trusts—Evidence Insufficient to Establish a Resulting Trust.**

6. The evidence examined and *held* insufficient to show that plaintiff furnished all the money to purchase all the property involved, so as to create a resulting trust for her in property taken by the husband in his own name.

**Trusts—Evidence Necessary to Establish Resulting Trust.**

7. In order to establish a resulting trust by parol, the evidence must be full, clear and convincing, and unattended by doubt or uncertainty, and evidence of intention to transfer the property, or promise to do so, or that he was indebted to the *cestui que trust,* is insufficient to show a resulting trust.

**Pleading—Complaint—Admissions so as to Preclude Attack.**

8. Where in a suit to enjoin an execution sale the complaint refers to the judgment recovered by defendant against the husband of plaintiff as a "pretended" one, and in the reply plaintiff denies the allegations of the answer as to the facts on which the judgment was obtained, defendant cannot claim that the judgment was admitted to have been "duly rendered" so as to preclude an attack by plaintiff thereon.

From Marion: William Galloway, Judge.

In Banc.   Statement by Mr. Justice Bean.

This is a suit brought by the plaintiff, Grace D. Barnes, to impress a resulting trust in her favor upon the lands described in the complaint, as the equitable owner thereof, as against defendant L. S. Barnes, who

holds the legal title thereto, and defendant A. B. Spencer, who has a money judgment against him, and to enjoin the defendant Esch, sheriff of Marion County, from selling the same upon an execution issued on Spencer's judgment. From a decree in favor of plaintiff as prayed for in her complaint, defendants William Esch and A. B. Spencer appeal. Defendant L. S. Barnes never appeared in the case to controvert the complaint.

In her complaint plaintiff alleges, in substance, that in the autumn of 1909, she furnished her husband the sum of $26,750, in cash, for the purpose of buying real property in Marion County, fully described in her complaint, the title to which was to be taken in her name; that with this money he bought the realty in question, and by mistake the legal title was taken in his name, and still remains so, except a portion thereof, described, situate on East State Street in the City of Salem, being the residence and homestead of the plaintiff and defendant L. S. Barnes, a part of which was conveyed to them jointly as tenants by entirety. Plaintiff alleges the rendition of a judgment on February 24, 1913, for $69,399, with interest at 6 per cent per annum, and $29.50 costs, in an action wherein defendant A. B. Spencer was plaintiff and defendant L. S. Barnes was defendant; and the levy of the execution upon the property in question by the defendant sheriff: See *Spencer* v. *Barnes,* 65 Or. 231 (132 Pac. 707, Ann. Cas. 1915A, 1287). It is then averred:

"That the said judgment so rendered in this court is based and founded upon a pretended judgment recovered by the said defendant Spencer against the said defendant Barnes in the Superior Court in and for the county of Los Angeles, in the State of California."

The complaint shows that the California judgment has been appealed from, but that the appeal had not then been determined.

The defendants William Esch and A. B. Spencer answered jointly, denying that plaintiff furnished to her husband any of the money with which the property in question was purchased, and denying her alleged equity therein. Affirmatively they assert that the consideration of the Spencer judgment is his interest in a partnership transaction between him and L. S. Barnes in the sale of certain iron mining claims in the State of California. They aver ''that in the sale of said mining claims said partnership made a net profit amounting to $138,650, all of which the defendant Legene S. Barnes received and converted to his own use,'' that the property in question was bought with funds belonging to that partnership, and that plaintiff is not the owner of any equity therein, nor has she any inchoate right of dower as the wife of L. S. Barnes. The defendants further allege that when the Spencer execution was levied on the lands described in the complaint, he had neither knowledge nor notice of plaintiff's alleged equity therein, and that he thereby acquired a valid lien thereon in good faith as a *bona fide* purchaser. The affirmative matter of the answer is denied in the reply. Plaintiff avers therein that Spencer and Barnes were never partners; that the former contributed nothing to the sale of any mining claims in California or elsewhere; that his pretended claim was fraudulent and without consideration; and that his judgment was obtained by fraud on his part and procured by false testimony.

In the California action of *Spencer* v. *Barnes,* the plaintiff therein alleged that he and defendant Barnes had procured the sale of certain mining claims, and

thereby a large amount of money as commission, which belonged to them in equal shares. The testimony of Barnes was taken by deposition, and about three weeks afterward he went to New York City. During his absence the action was called for trial and tried. Spencer was permitted to amend his complaint so as to claim a general partnership with the defendant Barnes, and in effect abandoned his original claim. The cause was tried in the absence of Barnes, and by changing Spencer's contention the former did not have the benefit of his own testimony upon the new issues which were formed by the amendments made by the latter at the trial. In the original complaint Spencer claimed an interest in the commission upon the sale of mining claims when in fact none whatever was earned in the sale thereof; and by the amendments Spencer was permitted to claim an interest in other transactions, concerning which Barnes was not given an opportunity to testify.

The first parcel of land described in the complaint is designated in the evidence as the Salem Hotel property, situate on the corner of High and State Streets, the second as the Burrows, the third as the Hofer, and the fourth as the Barber property.

In regard to plaintiff's right to the realty in controversy, her claim is about as follows: She and Mr. Barnes were married at Raton, New Mexico, January 2, 1902. At that time she had about $25,000. After they were married they went to Missoula, Montana, where they purchased a home with her money, taking title in her name. This was afterward sold, and they bought land at Trout Creek, in the same state, title to a part of which was also taken in her name. A large portion of this was disposed of at a profit, and the pro-

79 Or.—14

ceeds invested in Long Beach, California, where they bought and sold different tracts of land, the largest deal being the purchase of a ranch for $56,000, using her money, which they sold for $71,600. She purchased and took title to a home at Long Beach, and also one at Los Angeles, when they moved there in 1908. This latter home was sold and another one bought in her name. The one she sold was not paid for, and she took it back, so that at the time of the purchase of the Salem realty she had two properties in Los Angeles. In the summer of 1909 they sold rooming and lodging houses for $17,500, and also other property, and $20,000 was returned to her and deposited to her credit August 10, 1909, in the Citizens' National Bank of Los Angeles. On August 12th a further deposit of $276.50 was made to her credit. Her husband transacted all the business for her. In August, 1909, Barnes went to Denver, Colorado, and she came to Salem, where she learned that the Salem Hotel was for sale. Her husband joined her in September, and she requested him to buy the property with her money. On September 24, 1909, he drew a check on the Citizens' National Bank account, signed Grace D. Barnes, by L. S. Barnes, for $2,000 in favor of Derby & Wilson, real estate agents, as an initial payment for the hotel property purchased of Mr. Joseph Meyers. On the same date a check was drawn and signed in the same manner in favor of the Capital National Bank of Salem for $17,000, for the payment of the balance on the purchase when the title should be approved. Mr. Barnes directed the deed to be made to her. She mortgaged land which she owned in Los Angeles, for $5,000, with which the Hofer property was bought in May 1912. The sum of $2,500, was borrowed of Ladd & Bush upon the note of L. S. Barnes, pledging as security her Masonic Temple bonds. With this the

Barber property was purchased. After the purchase of the Meyers realty, she and her husband returned to California, and at a later date the transaction was completed and the deeds recorded. The error in making the deed to L. S. Barnes, instead of to her, was not discovered until some time later, when he promised to correct it by conveying the real estate to her, but he had not done so at the time this suit was commenced. It is shown that at the time Mr. and Mrs. Barnes were married she had a bank account of about $1,000, and considerable jewelry, diamonds, etc. Barnes does not appear to have had any property at that time.

As to the equities pertaining to defendant Spencer's judgment it is claimed on behalf of plaintiff that in June, 1907, L. S. Barnes went to Tucson, Arizona, where Spencer resided, for the purpose of examining some copper mines, of which they took pictures. While they were in the photo gallery, one Parker, the photographer, showed them specimens of iron ore from Riverside County, California, and informed them that there were options upon the property running until September. A conversation was had between Spencer and Barnes in regard to co-operating in making a sale of mining property on equal shares. Spencer says he was to see about getting the mines in Arizona, furnish the necessary papers, descriptions, and prices, and forward them to Barnes, who would attend to the end in Los Angeles. The latter part of August, Parker furnished Spencer the data concerning the iron claims blue-prints of the condition, description and price of each, and the name of the owner, which Spencer forwarded to Barnes at Long Beach, who secured the options. In June, 1907, Barnes sent a form of option to Spencer for Parker's signature which Spencer was unable to secure. This option was sent within a short

time after the first conversation. Barnes later got Parker's option. Spencer corresponded with Barnes until December, 1907. On August 19th of that year he wrote to Barnes, asking him to return the maps and papers which he had sent him, saying, "We will go out of the mining business." Barnes sent him all the maps, etc., that he had at the time. They did not see each other again until October, 1909.

Barnes' version of the transaction as to his efforts to sell the mining property is that he took the matter up with various parties in Los Angeles, Duluth, Iron Mountain, Michigan, Denver, and with the United States Steel Company, of New York and San Francisco. He says he made six trips to New York to close the deal, and worked continuously on the proposition for 2 years and 7 months. After these options lapsed he secured others, and finally entered into negotiations with Mr. E. H. Harriman, with whom he closed the deal. After the first transaction fell through, he found that he could not carry out any deal without taking up other claims, so he made an entry on 30 additional ones of 600 acres. He made arrangements for money to use in locating the claims, made several trips to the properties, put in two or three mining camps, and did work thereon. From that time on he heard nothing from Spencer until after the deal was consummated, more than 2 years later. He put in several thousand dollars defraying the expenses of these trips and locating the 30 claims. The name of A. B. Spencer was never entered in any of the options. He was absolutely unknown in any of the transactions after some time early in the fall of 1907, and never invested a dollar to promote the sale. The record contains quite a large mass of correspondence, telegrams, and exhibits relating to the negotiations and deals.

For the efforts made by the people interested with Barnes in the North American Steel Company, he later paid them $7,500. He turned over a one-fourth interest in the 30 claims to a Mr. Shonts and his associates, receiving $5,000, together with their assistance in selling the claims; and one Anderson, at the time the deal was closed, received $85,000 for this one-fourth interest. The 30 claims were 65 miles from a railroad, and from 12 to 26 miles from water, which was packed in on mules at an expense of about $8 per barrel. Engineers were sent to examine the property, and the cost of taking them in was from $2,500 to $3,500 per trip. Barnes purchased a one-hundredth interest in the patented claims of one Alice M. Stocker for $6,500, and secured a one-sixth interest in the claim of a Walter M. Brown. These, together with his remaining interest in the 30 claims and his interest in some watering places, he sold to Mr. Harriman for $100,000. The properties were transferred to the Iron Chief Mining Company organized for that purpose. Spencer contributed nothing toward securing the properties, and took no interest in the deal. The only work which he actually did was to obtain the maps and data from Parker and forward the same to Barnes at Long Beach in August, 1907, which was probably worth $10 or $15. After the sale of the mining property Spencer claimed an interest in the commissions, of which there appeared to be none, and brought action in California, alleging that defendant Barnes had procured the sale of mining claims and earned a large amount, as commission, which jointly belonged to him and Barnes in equal sums, as partners. During his absence judgment for $69,339 was obtained for a small amount of labor, without Barnes having an opportunity to present his version of the transaction.

MODIFIED.        REHEARING DENIED.

For appellants there was a brief over the names of *Mr. Oscar Hayter, Mr. Woodson T. Slater* and *Mr. Myron E. Pogue,* with oral arguments by *Mr. Hayter* and *Mr. Slater.*

For respondent there was a brief over the name of *Messrs. Fulton & Bowerman,* with an oral argument by *Mr. Jay Bowerman.*

MR. JUSTICE BEAN delivered the opinion of the court.

1. The defendant Spencer claims as a purchaser in good faith for a valuable consideration, under the provisions of Section 301, L. O. L., which provides that from the date of the attachment, until it be discharged or the writ executed, the plaintiff, as against third persons, shall be deemed a purchaser in good faith and for a valuable consideration of the property attached, and under Section 233, subdivision 4, L. O. L., which declares that an execution is levied on property in the same manner and with like effect as similar property is attached. Defendant maintains that the property is not subject to the prior equity of plaintiff. In order for defendant Spencer, as an attaching creditor, to be deemed a purchaser in good faith and for a valuable consideration as against the plaintiff, Grace D. Barnes, who is the owner of an outstanding equity in the property upon which execution was levied, the defendant must allege and prove all the facts necessary to establish that character of his ownership as against such equity. One of such material facts is that his claim is founded upon a fair valuable consideration: *Flegel* v. *Koss,* 47 Or. 366 (83 Pac. 847); *Rhodes* v. *McGarry,* 19 Or. 222 (23 Pac. 971); *Haines* v. *Connell,* 48 Or. 469 (87 Pac. 265, 88 Pac. 872, 120 Am. St. Rep. 835). An at-

taching creditor, although placed on an equality with a purchaser, cannot claim any greater privilege than would be granted to such purchaser: *Jennings* v. *Lentz,* 50 Or. 483, 487 (93 Pac. 327, 29 L. R. A. (N. S.) 584). The defendant Spencer recognized this principle, and by his amended answer has alleged facts to bring him within the rule laid down in the *Rhodes-McGarry Case.* The question therefore recurs upon the proof and the equities of the case.

2. It is the contention of counsel for Spencer that plaintiff cannot question the judgment rendered in *Spencer* v. *Barnes.* It is said by Mr. Freeman in his work on Judgments (3 ed.), Section 162:

"It is well understood, though not usually stated in express terms, in works upon the subject, that no one is privy to a judgment whose succession to the rights of property thereby affected occurred previously to the institution of the suit."

The question as to whether or not Mrs. Barnes can compare her equities in the property in controversy with those of Spencer, who has a judgment which is valid and binding as between him and Barnes, the parties thereto, is an important one. Our statute and decisions thereunder place a judgment creditor in practically the same position as a purchaser holding under a deed subsequent to the equities claimed. In *Gottlieb* v: *Thatcher* (C. C.), 34 Fed. 435, it was held by Mr. Justice BREWER that, as against a prior grantee and purchaser at an execution sale under a preceding judgment, a subsequent judgment against the grantor and debtor is not conclusive, either as to the amount of the debt, or as to the circumstances and character of the transaction out of which the indebtedness arose, and where made defendant to a bill by the holder of such judgment to set the conveyance aside as in fraud of

creditors, and to subject the land, such prior grantee and purchaser may show that the debt for which the judgment was rendered had been more than paid when it was obtained, and that the creditor had taken an unfair advantage of the debtor in the matter of interest. In *Ingals* v. *Brooks,* 29 Vt. 399, the facts of the case were as follows: Israel Brooks conveyed all his lands to his son Clark Brooks, and as part consideration therefor Clark agreed to pay the debts of his father. Leafy Brooks, who had become the wife of Ingals, presented a claim against the father, against which the son Clark maintained he had a setoff. They compromised, Clark Brooks released his setoff, and Ingals and wife threw off half the claim. Ingals then went to Israel Brooks and got him to allow judgment to go against him for the other half of the claim, of which proceeding Clark had no notice. Ingals then levied execution under this judgment on the lands held by Clark Brooks, and sold the same, and in course of time got a sheriff's deed and began his action in ejectment. The court uses the following language:

"The judgment, being altogether *inter alios,* and in express violation of the understanding of Clark when he surrendered the claim against Leafy, one of the plaintiffs, and paid half the amount of the note in money, in agreed satisfaction of the whole, could have no effect upon the defendant Clark. He is entitled to show that the note was paid before sued, or that the judgment was, for other reasons, fraudulent to him: *Atkinson* v. *Allen,* 12 Vt. 619. This compromise of the note by Clark was just as effectual a bar to the claim, in law, and just as effectual a release of his undertaking to pay it at the time of the conveyance, as if he had paid all the money upon it."

It is true he did undertake or "promise to pay all the debts of the grantor (his father), but he has in fact

paid them all, except the mortgage, which is not in question. And the judgment against Israel (the father), is either a subsequent debt, founded exclusively upon his promise to pay what they did not get of Clark, and which in no sense, under the circumstances, can be regarded as forming any portion of the debts which Clark was to pay, or else the whole proceeding, so far as it is attempted to give it the appearance of a prior claim, is a fraud upon the compromise and settlement made with Clark, and the consequent surrender of the note. And in either case it will not enable the plaintiff to treat the conveyance as void, and levy upon it as the land of Israel Brooks. Judgment reversed. Case remanded.''

In *Boutwell* v. *McClure,* 30 Vt. 676, the court says:

''The judgment upon the plaintiff's claim in this action, whether rendered before or after the claimant's appearance, concludes nothing upon the question. In all such cases there is likely to exist the form of a contract of a date early enough to accomplish its purpose, and it is not uncommon that this contract assumes the more solemn form of contracts, such as that of a promissory note, or even a judgment of a court of record. But in either case they are, of course, only conclusive upon the parties to such contracts. Upon any questions arising in regard to the creditor being *bona fide* such at a particular date, and continuing such to the present time, the contract is but *prima facie* evidence of the fact. It is always competent to impeach the debt, either as to its *bona fide* character, its date, or its continuance. For although the debt once existed, and of a date early enough to override the plaintiff's claim, yet, if it has been extinguished by payment on the part of the debtor, it sinks at once into the common mass of his assets, and cannot be subsequently kept on foot, as the debt of a *bona fide* creditor.''

In *Temple* v. *Osburn,* 55 Or. 506 (106 Pac. 16), plaintiff held title under an unrecorded deed. Defendants,

by a conveyance ordered by the court, in a subsequent suit in which plaintiff was not a party, held that plaintiff was not bound by the decree.   It was held in *Davis v. Davis,* 20 Or. 78 (25 Pac. 140), that when the title of a grantee is attacked for fraud by a judgment creditor, the grantee may look behind the judgment and ascertain whether or not there was an actual indebtedness between the parties upon which the judgment is founded.

3. Where one claims real estate as a purchaser in good faith and for a valuable consideration, as does defendant Spencer in this case, although he may claim by virtue of a judgment of a court of record, as. between such claimant and one having prior equities in the property, the record title to which is in the name of a trustee, the amount of the actual value of the consideration becomes a material question.   In order to determine the equities between the parties the court must, of necessity, take cognizance of the value of such consideration by virtue of which the defendant claims and has pleaded and would have weighed against the equities of the plaintiff.   All that Spencer claims to have done in the premises was to make the arrangement with Barnes in June, 1907, and forward the data furnished by Parker to Barnes at Los Angeles, which was soon returned at his request.   Spencer has not shown that he has parted with a fair and valuable consideration in the premises so as to bring him within the protection of Section 301 of the statute, as a purchaser in good faith for a valuable consideration: *Rhodes* v. *McGarry,* 19 Or. 222 (23 Pac. 971), and other authorities, *supra.*

4. It is an ancient equitable principle that a beneficiary estate follows the consideration and attaches to the party from whom the consideration comes.   The doctrine is settled in England, and in a great majority of

the American states, that where property is purchased and the conveyance of the legal title is taken in the name of one person, while the purchase price is paid by another, a trust at once results in favor of the party who pays the price, and the holder of the legal title becomes a trustee for him: Pomeroy, Eq. Jur. (3 ed.), § 1037; *Berry* v. *Wiedman,* 40 W. Va. 36 (20 S. E. 817, 52 Am. St. Rep. 866); *Denny* v. *Schwabacher,* 54 Wash. 689 (104 Pac. 137, 132 Am. St. Rep. 1140); *Siling* v. *Hendrickson,* 193 Mo. 365 (92 S. W. 105).

5. As a general rule, trust property is not liable for the trustee's debts, and cannot be reached by attachment or execution, even though the trustee's creditors have no knowledge of the existence of the trust; the record title being in the name of the trustee. But any beneficial interest the trustee may have in the estate may be reached by attachment or otherwise: 39 Cyc. 227f; Perry, Trusts (6 ed.), §§ 15, 346; 1 Black, Judgments, § 421; 2 Freeman, Executions (3 ed.), 173; 28 Am. & Eng. Ency. Law, 940, and notes; *Meier* v. *Kelly,* 22 Or. 136 (29 Pac. 265); *Dimmick* v. *Rosenfeld,* 34 Or. 101 (55 Pac. 100); *Smith* v. *Farmers' etc. Bank,* 57 Or. 82, 87 (110 Pac. 410); *Hart* v. *Bank,* 33 Vt. 265; *Houghton* v. *Davenport,* 74 Me. 590. A resulting trust is within the operation of the rule noted: *School Dist.* v. *Peterson,* 74 Minn. 122 (76 N. W. 1126, 73 Am. St. Rep. 337). Anent this question former Mr. Justice BEAN, at page 139 of 22 Or. (at page 267 of 29 Pac.) of the opinion in *Meier* v. *Kelly,* 22 Or. 136 (29 Pac. 265), said:

"As a general rule, unless otherwise provided by statute, a judgment lien only attaches to the actual and not the apparent interest of the judgment debtor in land, and is subject to all equities which were held against the land in the hands of the judgment debtor at the time the judgment was rendered, whether known to the judgment creditor or not. When called upon in a

proper case, courts of equity are always ready to protect the rights of those who hold such equities as against the judgment lien, and to confine the latter to the actual interest of the judgment debtor. For this purpose they will correct a mutual mistake in the description in a mortgage, and, as corrected, give it priority over a subsequently acquired judgment'' (citing many authorities).

The syllabus in *Dimmick* v. *Rosenfeld,* 34 Or. 101(55 Pac. 100), is as follows:

''After-acquired property. — Lands purchased through an agent who took the title in his own name, without the principal's knowledge or consent, and then conveyed to her, are not thereafter subject to execution on a prior judgment against the agent, since he had only the bare legal title without any interest in the property itself.''

At page 104 of 34 Or. (at page 101 of 55 Pac.) of the opinion we find this quotation from *Snyder* v. *Martin,* 17 W. Va. 276 (41 Am. Rep. 670):

''Independent of any statute law, the lien of a judgment is a charge upon the precise interest which the judgment debtor has, and upon no other. The apparent interest of the debtor can neither extend nor restrict the operation of the lien so that it shall encumber any greater or less interest than the debtor in fact possesses. The judgment creditor has a charge on the interests of the defendant in the land, just as they stood at the moment the lien attached; therefore, though he seems to have an interest, yet, if he have none in fact, no lien can attach. The rights of the judgment lien owner cannot exceed those which he might acquire by a purchase from the defendant, with full notice of all existing legal or equitable rights belonging to third persons.''

6. We find that the evidence in the case under consideration clearly shows that the Salem Hotel property was purchased of Mr. Joseph Meyers, and that $19,250

was paid therefor, with Mrs. Barnes' money, which was obtained by the sale of real estate in California; that the Hofer property was bought and paid for with $5,000, the money of Mrs. Barnes, which was raised upon a mortgage given on her real estate in Los Angeles; that the Barber property was purchased with money belonging to Mrs. Barnes for $2,500, raised by hypothecating her Masonic Temple bonds. The decree as to these three parcels of property is affirmed. As to the Burrows property, it was bought for $4,000. It is described as follows in the complaint:

"Also beginning at a stake at the intersection of Division and Liberty Streets, in the City of Salem, Marion County, Oregon, and bearing north from the northwest corner of block No. 26 in said city and 99 feet distant, and running north along the east line of said Liberty Street, 165 feet to a stake; thence east 165 feet to a stake; thence south 165 feet to a stake; thence west 165 feet to the place of beginning, and situate in Marion County, Oregon.

"Also the following described premises to wit: Commencing at a stake on the east line of Liberty Street in the City of Salem, one hundred and sixty-five (165) feet north from the point where the east line of Liberty Street intersects the north line of Division Street, as shown by the recorded plat of the City of Salem; thence northerly along the east line of Liberty Street, twenty-five (25) feet; thence easterly, at a right angle to said Liberty Street, one hundred and sixty-five (165) feet; thence southerly parallel with said Liberty Street, twenty-five (25) feet; thence westerly one hundred and sixty-five (165) feet to the place of beginning, being and lying in lot No. seven of the unnumbered block lying immediately north of block No. 26 in the said City of Salem, Marion County, Oregon."

Practically all the testimony in regard to the funds with which this property was bought is that of Mr. Barnes, to the effect that his wife bought the same from

her sister for her mother; that he "put the money up"; that it was some he received for wages; that he paid $4,000 for it, and obtained the money "from a bank account of my own in Los Angeles." The evidence fails to show that this piece of realty was purchased with Mrs. Barnes' money. Moreover, Mrs. Barnes alleges in her complaint that she advanced the sum of $26,750 to her husband for the purpose of buying the lands described in the complaint. The Salem Hotel property at $19,250, the Hofer property at $5,000, and the Barber property at $2,500 totals that amount, $26,750, leaving none of her funds for application on the Burrows property.

7. To establish a resulting trust in property by parol testimony the evidence must be full, clear and convincing. If it is attended by doubt and uncertainty, the writing must remain the highest and best evidence: *Snider* v. *Johnson,* 25 Or. 328, 332 (35 Pac. 846); *Barger* v. *Barger,* 30 Or. 268 (47 Pac. 702); *Oregon Lumber Co.* v. *Jones,* 36 Or. 80, 85 (58 Pac. 769). It is not enough that Barnes may have intended to transfer the Burrows property to his wife, or that he had promised to do so, or that he justly owed her an amount of money equal to the price thereof. That is not plaintiff's claim as asserted in her complaint. The decree of the lower court as to the Burrows property is modified so as to exclude the same from the injunction.

8. It is contended by defendant Spencer that the plaintiff cannot question the fairness of the Spencer judgment, for the reason that the complaint alleges that such judgment was duly rendered. That pleading, however, refers to this judgment as a pretended one. Defendant's answer pleaded "that the consideration of the said judgment of the defendant A. B. Spencer against the defendant Legene S. Barnes is a balance of

$69,339, found due said Spencer from said Barnes by the Superior Court in and for the county of Los Angeles, State of California, upon an enforced accounting against said Barnes of a partnership business con-ducted by said parties from August 28, 1907, until the autumn of the year 1909, for the sale of certain iron mining claims in the State of California.''

In reply thereto, the plaintiff properly states that Spencer was never a partner of defendant L. S. Barnes, and assails the equities of the judgment by an appropriate reply concerning the consideration of the judgment.

With the modification above mentioned, the decree of the lower court is affirmed; neither party to recover costs herein.          MODIFIED.   REHEARING DENIED.

MR. JUSTICE EAKIN did not sit.