Argued November 7; affirmed December 12, 1945

JOHNSTON *v.* McKEAN ET AL.

(162 P. (2d) 820)

*Charles W. Reames,* of Medford, for appellant.

*Gus Newbury,* of Medford, for respondent McKean.

BRAND, J.

Prior to January 6, 1942, Douglas County announced that on that date an auction sale would be held of certain timber lands in Sections 15 and 20, T. 32 S., R. 2 W., Willamette Meridian. The minimum price for the whole of said lands was fixed at $3,000 with a required down payment of at least $600, and the balance to be in four yearly payments with interest at six per cent. The portion of said lands in Section 20 could be bought for not less than $1,500 with not less than a $300 down payment and like interest on the balance.

The following is a brief summary of the testimony in support of plaintiff's claim:

Prior to January 4, 1942, the plaintiff became aware of the proposed timber sale, investigated the timber in Section 20, and "on or around the 4th of January" informed defendant of the favorable opportunity and asked the defendant for money so that he might bid on the timber. Plaintiff repeatedly testified that the defendant then gave him a check for $300 in response to his request. The defendant discussed with him the

matter of attending the sale. But later the plaintiff called the defendant up, and defendant "said he wasn't interested and didn't think he would be down." Plaintiff went to Roseburg on January 5th and conferred with Mr. Darby, the deputy sheriff in charge of the sale. He left with Darby his personal check for $300 upon Darby's representation that it would be permissible for him to bid in that manner on the timber in Section 20. The plaintiff says the check was accepted by Darby, but it is clear that no rights were acquired in the timber thereby. The understanding was that on January 6th the check would be treated as the minimum required bid and might be accepted if no higher bid was made. Plaintiff had intended to return home on January 5th, but changed his mind and returned to Roseburg to attend the sale so that "if we were overbid we could bit [bid] a little more."

Up to this point there is no evidence of any agreement that plaintiff and defendant were to purchase any of the timber jointly. On January 6th, plaintiff met the defendant at the courthouse.

Plaintiff testified:

"I told Mr. McKean what I had done and he said he had made arrangements to raise some more money and we talked at length and he wanted me to raise $300 and we would buy both tracts of timber which I wasn't able to buy at the time and I agreed to take down the $300 check and he would bid both pieces in. He said he had money to do that at that time and we would have it together; he was supposed to put it in both of our names.
\* \* \*

"I withdrew my check, and Mr. McKean put up $600 which was supposed to be for both of us. He owed me somewhere around $4,000 and he was to take it out of my account for my part of it."

After withdrawing his check, plaintiff says he destroyed it.

The defendant then bid in the timber lands offered in both Sections 15 and 20 at the minimum price fixed by the County, to-wit, $3,000, with the required minimum cash payment of $600. The defendant gave the sheriff his check No. 6850 for $601. The check is in evidence as defendant's Exhibit 2, and it was signed "Talent Sawmills, by F. M. McKean," that being the name under which the defendant was doing business and under which his account was kept. The additional dollar was required to cover the cost of recording the deed when it should be issued. A certificate of sale was issued by the County to the defendant alone as purchaser; and a contract, defendant's Exhibit 5, "for resale of tax lands" was later executed under date of January 6, 1942, wherein the County appears as vendor and the defendant as vendee.

Concerning a conversation which occurred just outside of the courthouse after the defendant had bid in the property, the plaintiff testified as follows:

"A. * * * I told him that I should have a little more money than a fifty percent interest in it and he agreed on paying me $200 at that time for what I done.

"Q. What did he pay you $200 for?

"A. That was for me; I had run over the timber and made the trips to Roseburg and found out about the timber and he didn't know anything about timber. I thought I should have that much more than fifty percent of the timber.

"Q. Now, was there anything said about where Mr. McKean was going to get this $300 of the money that was being put up for you?

"A. I had over $4,000 coming or somewhere in that neighborhood and he was supposed to take it out of my account."

The defendant did in fact give to the plaintiff a check for $200 at that time in response to the request. The check is in evidence as defendant's Exhibit 1 and was cashed by plaintiff in a bank in Roseburg on January 6th.

The plaintiff testified that he asserted to the defendant his claim for a half interest in the property around March 1942 or later but before the complaint was filed. He apparently refers to a conversation which led to an agreement that the parties should meet at the office of the plaintiff's attorney in Medford. Plaintiff testified:

"Mr. McKean was supposed to put it in both of our names * * * and he was to meet me at Mr. Reames' office to fix these papers up."

Plaintiff testified that the defendant never denied that plaintiff had a half interest. Again he said:

"He agreed to meet me at Shady Cove on Sunday and we would straighten it up."

This alleged conversation was in July 1943. Plaintiff testified that defendant offered to purchase plaintiff's half interest. He testified further that the defendant told Mr. Saubert, a Forest Service official, that defendant had bought the plaintiff out.

In partial support of his own case, the plaintiff presented the testimony of M. G. Heath, who was then an employee of the plaintiff. Heath testified that the plaintiff asked him to accompany plaintiff on a visit to the defendant and that the plaintiff asked the defendant "if he would sell their timber so that he could have his money out of it; he wanted his money."

Again Heath testified:

"A. * * * Mr. Johnston asked him, 'I would like to have my share of the timber or the money out of that.' He said, 'I have got fifty percent interest in that.' Mr. McKean says, 'Yes, you do have fifty percent interest.' "

The conversation at which Heath was present occurred in March or April 1943, and it was on this occasion, according to the plaintiff, that they agreed to meet at Shady Cove and "straighten it up." The proposed meeting at Shady Cove was not held because the plaintiff notified the defendant of his inability to attend. Plaintiff had commenced his suit and had secured a temporary injunction on December 12, 1942, several months previous to the conversation concerning which Heath testified.

From plaintiff's brief we read:

"McKean told Johnston * * * that he was not going to "gyp" Johnston out of his interest in the timber; that he had a half interest in it, and he would see that he got it."

This is a misconstruction of the testimony. It was plaintiff, and not the defendant, who made the quoted statement. Johnston's testimony was as follows:

"Well, I was trying to get a settlement out of Mr. McKean and talked about timber and said he wasn't going to jip me out of it; I had a half interest. He agreed to meet me at Shady Cove on Sunday and we would straighten it up."

Plaintiff's corroboration of Mr. Heath's testimony is very limited. He admitted that he was drinking on that occasion but claimed that he was not under the influence and said that he demanded a settlement "on this litigation and a settlement on the rest for our

books, what we had coming.'' He said the defendant
''agreed to make some kind of settlement but never
has.'' He nowhere states directly that the defendant
made the admission as testified by Mr. Heath. Heath
testified at the time of the trial on January 28, 1944,
that the plaintiff never told him they were going to
see the defendant nor that the plaintiff had already
sued the defendant. He said that the lawsuit was not
mentioned and the plaintiff, even after the conver-
sation, never informed him that a lawsuit was pending.
Heath's testimony concerning the alleged admission
of March 1943 is weakened by the evidence that both
the plaintiff and Heath had been drinking, and that
upon arriving at the defendant's office the defendant,
the plaintiff and Heath went outside and, according
to the testimony of Heath, the plaintiff produced a
bottle of whiskey and a bottle of brandy and they all
drank from both. They had ''two, three or four.'' It
is the judicial opinion, whether from observation or
introspection, that such conduct stimulates the imagi-
nation but blunts the memory. We have serious doubts
concerning the accuracy of Heath's testimony. Ten
months after the event he purports to quote directly the
words of the defendant on a controversy which he did
not know existed.

Plaintiff also called the witness Saubert, an em-
ployee of the Forest Service, but we think his testi-
mony weakens the plaintiff's case. Saubert's testi-
mony related to an occasion when Forest Service offi-
cials met with the defendant to investigate the de-
fendant's ability to perform a proposed logging con-
tract with the Government. His recollection was that
the defendant had said he was going to buy the plain-
tiff's logging equipment, and the question was whether

that equipment was adequate for the job. The conversation did not relate to the timber purchased at Roseburg, and Saubert's testimony makes it clear that the defendant was referring to a purchase of logging equipment and not to a purchase of plaintiff's alleged interest in the Douglas County timber.

■ Plaintiff also called Deputy Sheriff Darby, whose memory was confessedly defective as to the occurrences on January 5 and 6, 1942. When asked if there was any conversation about the plaintiff leaving a check, Darby said:

"Well, there was some conversation about it, but I don't know what it was.

"Q. Did he leave a check there?

"A. I couldn't definitely say that; I don't know; he may have; I think he did, but I don't know."

After saying that he could not definitely recall and after some leading questions, the witness said he did recall that a check was left with him by the plaintiff. The witness testified:

"A. I don't know whether that check was drawn down or they gave me another check. They had some conversation there about it and I don't know whether they drew down the check or whether that check went in on the purchase price; I couldn't say about that.

"Q. Mr. McKean and Mr. Johnston did have a conversation about it in your presence? A. Yes.
*   *   *

"A. They talked about whether they would do this or that and something about the check and then they said something about, 'well, just as well make the contract out to you; it is all right with me.'"

Witness said there was nothing mentioned in the conversation about who was to own the timber. Asked concerning his impression from the conversation, the witness said:

"Well, if I had been doing it from the conversation I heard, why, I would say it was just a couple of friends buying it together."

The answer was properly stricken by the Court.

We will next summarize the evidence supporting the contention of the defendant. The plaintiff was logging for the defendant who operated a sawmill. Plaintiff was interested in the purchase of the Douglas County timber in that he expected to do the logging thereof. Plaintiff told the defendant of the proposed sale by the County; and, on or about the 6th of January, 1942, the defendant deposited $300 to the plaintiff's account in the bank at Medford because, as the defendant said, "he asked me to deposit it for him." The fact of the deposit is established by plaintiff's Exhibit E, a carbon copy of the deposit slip showing a transfer of $300 by the defendant to the plaintiff. The transfer was approved by the bank and was made on January 6th. The exhibit bears the endorsement, presumably by the defendant's bookkeeper, "Our check #6855." The defendant gave no check directly to the plaintiff.

Defendant's ledger which was introduced in evidence by the plaintiff shows, under date of January 7th, a payment to the plaintiff in the sum of $300 opposite which is written "Deposited to Johnston bank a/c."

We are satisfied that plaintiff's Exhibit E represents the $300 which the defendant previous to January 6, 1942, promised to give, and thereafter gave, to

the plaintiff. If the plaintiff put up a check with the sheriff on January 5th, we think it was his own check drawn upon his bank account in reliance upon the defendant's promise made on or about January 4th that he would make the plaintiff such a payment.

Thus it appears that the agreement for the payment of this sum to the plaintiff was made prior to the meeting of the parties at Roseburg and before any agreement for the joint purchase of timber is even claimed by the plaintiff. That payment is not referable to and cannot support plaintiff's contention. Nor is there anything unusual in the fact that at plaintiff's request the defendant paid to the plaintiff's account $300 at that time. According to the defendant's ledger, the defendant owed the plaintiff $4,572.67 on January 1, 1942. The logging operation was a substantial one. Defendant's ledger shows that he made eleven payments upon their running account during the months of January and February alone. These payments varied in amounts from $200 to $700, totalling $4,800.

The defendant told the plaintiff before the sale that he would be in Roseburg on January 6th. They met at the courthouse prior to the sale. Plaintiff did not tell the defendant that the plaintiff had put up $300 with Darby. Defendant had no conversation about that matter and does not know that it was done. He did not know of any check being drawn down by the plaintiff before the sale. The defendant denied that he had any conversation with the plaintiff concerning fifty-fifty ownership of the timber to be purchased. The plaintiff was present when the defendant bid on the timber and saw the certificate of sale made out in defendant's name. Defendant testified that after the sale "Mr. Johnston said he ought to have something for his

trouble of telling me about this timber and coming up here.''

"Q. Did you pay him something? A. I did.
"Q. How much did you pay him? A. $200.''

The defendant was examined as an adverse witness by the plaintiff and was asked a leading question as follows:

"Q. Isn't it true that Mr. Johnston at that time told you that if you were going to take this timber fifty-fifty, he had been out considerable expense and you asked if $200 would be all right for the expense he had been out?''

He answered: "That is right.''

The question was a double one and somewhat misleading. In view of the defendant's consistent testimony denying any agreement to purchase the timber jointly, we think it is clear that he intended to admit only that he had asked the plaintiff if $200 would be "all right for the expense he had been out" and did not intend to admit the first portion of the question.

The complaint in this suit was filed on December 12, 1942. As stated by the plaintiff, the conference in the office of Mr. Reames, plaintiff's attorney, was to have been held prior to that date. When examined by Mr. Reames at the trial concerning that proposed meeting, the defendant testified:

"Q. Did you have any conversation with Mr. Johnston whereby you were to meet Mr. Johnston at my office in regard to an agreement—put in writing the matter of Mr. Johnston's interest in this timber?
"A. No, not regarding Mr. Johnston's interest in the timber. I had agreed to meet Mr. Johnston

at your office to talk it over. He alleged he had an interest in the timber; I remember that quite well. * * *

"A. I called you and I said, 'I don't think that I would come over there inasmuch as you were the attorney for Johnston and Mr. Newbury was mine and he was out of town and I thought if you were going to talk over, I didn't know what about, I better have Mr. Newbury with me.

"Q. At that time did I ask if you denied Mr. Johnston had any interest? A. I did.

"Q. What did you say? A. I said he had no interest."

Defendant also testified that on March 9, 1943, he told the plaintiff that the plaintiff had no interest in the timber. The conversation occurred at the defendant's office at the Talênt sawmill.

The testimony of the defendant is supported by that of George Zichefoose, defendant's bookkeeper, who testified that on or about March 9, 1943, Mr. Johnston came into the office and said:

" 'What are you going to do about that suit?' And Mr. McKean's answer was that, 'I am not going to do anything about it because you started the suit and you can go ahead and finish it; I have no interest in the suit.' "

Both the defendant and Zichefoose stated that the foregoing conversation preceded the occasion on which Mr. Heath was present.

Notwithstanding the testimony of the plaintiff, we think it probable that the defendant had at least twice denied that the plaintiff had any interest in the timber prior to the Heath conversation; and, after notifying the plaintiff in substance that he intended to defend the

suit, it appears highly unlikely that he would have admitted to Heath that the plaintiff was the owner of a half interest in the timber.

The defendant admitted that a conversation was had in July 1943, Heath being present. Concerning that occasion, the defendant testified:

"Mr. Johnston and Mr. Heath drove into the mill property down there and Mr. Johnston and Mr. Heath came into the office, and Mr. Johnston came in in a boisterous manner and put a bottle of whiskey on the counter and said, 'Have a drink.' I said, 'I will have a drink with you but I would rather not drink in the office. We will go outside and have a drink.', which I did. Mr. Johnston asked me at the time if I would be willing to sell my timber and I said I thought maybe I would. And he said, 'Well, what do you want for it, the whole works.' I said, 'I don't really know; I would have to think it over; I might take two and a quarter a thousand.' And he said, 'Will you make a definite answer as to that?' I said, 'No, I won't at this time.' 'Well', he says, 'when can you let me know.' I told him I would meet him Sunday at his place above Shady Cove. On a Friday prior to that he had come by my house and told Mrs. McKean he wouldn't meet me on Sunday because he was taking Mrs. Johnston on a visit to see her mother * * *.

"Q. There was no conversation had there in the presence of Mr. Heath in which you admitted Mr. Johnston had an interest in that timber? A. There was not."

The defendant was asked on cross examination if he did not have an agreement with Johnston to the effect that the plaintiff was to sell the timber to Alley Brothers, but in which Alley Brothers were to lease the mill, and the plaintiff and defendant were to split

fifty-fifty on the money that came from the sale. The defendant testified:

"I had offered to sell through Mr. Johnston. He had obtained the buyer, Alley Brothers, is correct. He had an opportunity to sell the timber he said that I bought from the Lewis Estate at $1.75 a thousand. Everything he got over $1.75 was to go to Mr. Johnston himself as a commission or whatever you call it, bonus or anything. He was to get fifty percent of the profits above the costs, whatever I got, but nothing less than $1.75, or over. On the Douglas County timber there, we were going to split that fifty-fifty over and above costs, provided he sold my mill at a price of $25,000."

The defendant also supports the testimony of the witness Saubert to the effect that the conversation at which Saubert was present related to the purchase by the defendant of the plaintiff's logging equipment but not of any interest of the plaintiff in the timber.

As a witness for the defendant, John Geertsen, an expert accountant, testified that he had examined all of the defendant's books relative to the Johnston account. He was asked:

"Q. Do you find any charge in these books against Johnston of any item of $300 which indicated that it was an advance payment upon timber? A. I do not."

Concerning defendant's check to the sheriff for $601, the witness testified that $600 was charged to contracts payable to Douglas County and $1 was charged to miscellaneous expenses. He testified as follows:

"That is the check of $601 that went to the sheriff down here in payment of that contract? A. That is right.

"COURT: It wasn't charged against Johnston, was it?

"A. No, sir.

"Q. There isn't any charge of $300 which indicates that it was an advancement by McKean to Douglas County for the account of Johnston? A. No.

"Q. No charge in the record against Johnston whatever?

"A. No, sir.  *  *  *

"Q. Do you find any other charge against Mr. Johnston's account of the $300 at that time aside from this check and from this credit memorandum, that is on January 6th or January 7th?

"A. Charged to Mr. Johnston's account?

"Q. Yes. A. No, sir.

"Q. That is the only one? A. That is the only one.

"Q. Undoubtedly this entry of January 7th is the very item that is referred to here as 6855? A. Yes, sir."

The defendant offered his journal sheets in evidence as Exhibits 7 to 11 inclusive; however, the transcript and the certificate of the trial judge both show that the plaintiff objected to their admission and that the objection was sustained. The journal sheets are not before us.

With the exception of the entry of $300 charged against the plaintiff on January 7th, which represented the bank transfer, (plaintiff's Exhibit E), there is no entry on defendant's ledger showing a $300 payment to the plaintiff or crediting his account in that amount until January 29th, and there is no evidence that the payment on that date had anything to do with the timber transaction. If, as plaintiff contends, the defendant on January 6th paid the sheriff $600 of which

one half was for the plaintiff, we would expect to find that the defendant on or about January 7th had charged two items of $300 each against the plaintiff in defendant's ledger, $300 representing the bank transfer shown by plaintiff's Exhibit E and $300 representing one half of the $600 payment. Yet only one such item appears.

Again the defendant's ledger, which appears to be accurate, shows that the defendant's indebtedness to the plaintiff was reduced to the sum of $93.09 on August 7, 1942, by a payment of $1500 on that date. If the defendant actually paid $300 for the plaintiff's benefit in addition to the payments shown on the ledger, then on August 7, 1942, he overpaid the plaintiff in the amount of the difference between $300 and $93.09, or $206.91.

Plaintiff's testimony concerning the circumstances attending the admitted payment to the plaintiff of $200 on January 6th is also subject to some doubt. If the defendant was buying the timber for himself, it is quite natural that he should have compensated the plaintiff for investigating its quality and furnishing information concerning it. If, however, the defendant had agreed upon joint ownership of the timber, it seems improbable that he would have paid the plaintiff $200 for his services in addition to putting up an additional $300 as the down payment of plaintiff's half interest.

■ Plaintiff contends that, if there is clear and convincing proof of the defendant's agreement to buy the timber for both of them, plaintiff could not be defeated in his suit merely by the fact that the defendant's books failed to show the true transaction; but the plaintiff himself offered the defendant's ledger for the

purpose of showing admissions against interest and he cannot now complain if the Court finds in it evidence tending to corroborate the defendant's position in the case.

Even disregarding all evidence from the ledger, we have serious doubts concerning the plaintiff's case. Plaintiff had received $300 from the defendant on January 6th which he claims he intended to use in the purchase of timber. If, prior to the sale, the parties agreed to bid in the timber in Sections 15 and 20 paying $600 therefor, why did he not then apply his $300 to the joint purchase instead of drawing down his check and depending upon the defendant to put up the money for both parties. Had the plaintiff then paid his half of the initial payment with his own check, the entire case would bear a different aspect.

■ We are convinced that the defendant did not buy the timber for the parties jointly, and we think the plaintiff has failed to establish that he agreed to do so.

■ It is the plaintiff's theory that a resulting trust has arisen in his favor. We have held that proof of either a resulting or a constructive trust must be clear, unequivocal and convincing. *Dahl v. Simonsen,* 157 Or. 238, 70 P. (2d) 49; *Holohan v. McCarthy,* 130 Or. 577, 281 P. 178; *Smith v. Barnes,* 129 Or. 138, 276 P. 1086; *Neppach v. Norval,* 116 Or. 593, 240 P. 883, 242 P. 605; *Barnes v. Spencer,* 79 Or. 205, 153 P. 47; *Chance v. Graham,* 76 Or. 199, 148 P. 63.

■ The very nature of the plaintiff's claim accentuates the difficulties ordinarily involved in attempts to establish resulting or constructive trusts by parol evidence. In most cases of this sort the plaintiff first shows that he paid his own money to the alleged trustee and then offers facts to prove from the cir-

·cumstances the existence of a trust. By the simple process of proving his own affirmative act in paying out money, he establishes a basis for further evidence; but in the case at bar the plaintiff did no act. He paid no money. He must prove his case, if at all, by establishing merely an agreement coupled with the act of the defendant in paying $600, an act susceptible of two different interpretations: (1) That the defendant in substance changed his position from debtor to trustee to the extent of $300, or (2) that he paid $600 for himself alone. When the plaintiff fails to prove that the defendant did in fact charge the plaintiff with one half of the $600, thus establishing that he ceased to be a debtor and became trustee to that extent, there remains nothing but the contradictory evidence concerning the bare agreement. The plaintiff in his brief frankly states that the defendant was a man of good reputation though he attacks his testimony as false. The trial judge heard the witnesses and his decision on the facts should not be disturbed.

■ The plaintiff tendered to the defendant two checks for approximately one half of the payments on the timber which became owing to the County in the months of January 1943 and 1944. Defendant retained the 1943 check for about a year and then both checks were returned to the plaintiff. Plaintiff must have known that neither check had been cashed and there is no evidence which could raise an estoppel from the mere retention of one of them under the circumstances.

The decree of the Circuit Court is affirmed.