Argued December 2, 1896; decided January 11, 1897.

BARGER v. BARGER.

(47 Pac. 702.) '

DISTINCTION BETWEEN RESULTING AND CONSTRUCTIVE TRUSTS.—A resulting trust is one where property is purchased with the money of another, though the title is not taken in such other's name; while a constructive trust ensues where the purchase is made and the title acquired secretly, and in violation of some duty to the cestui que trust; and in both cases the evidence that the money was furnished by and was expended for the alleged beneficiary must be clear and convincing: *Springer* v. *Young*, 14 Or. 280; and *Sisemore* v. *Pelton*, 17 Or. 546, applied.

PARTIAL RESULTING TRUST.—Where a trust is claimed to the extent of a part only, it must be decisively shown just what proportion of the price was paid by the alleged beneficiary, and that the payment was for some specified interest in the estate.

TIME WHEN TRUST ARISES.—A trust must always originate at the time the title is acquired, and the price for the interest claimed must then be paid or secured: *Taylor* v. *Miles*, 19 Or. 553, cited and followed.

TRACING TRUST FUND INTO TRUST PROPERTY.—So long as trust property can be traced and distinguished, although in changed form, it may be reclaimed; but when the identity of the original property is lost the trust escapes; from which it follows that either the entire ownership of the changed form of property must be established, or the ownership of some aliquot part of such property to sustain a trust therein.

IMPLIED TRUST—PURCHASE WITH WIFE'S MONEY.—Where a husband, without objection, uses his wife's money jointly with his own in a series of business ventures, no trust in favor of the wife can attach to a tract of land bought partly with the proceeds of the business and partly with borrowed money.

From Multnomah: LOYAL B. STEARNS, Judge.

Suit in equity by Rebecca J. Barger against Cyrus W. Barger and Eliza Helm, her children, and others, to have a trust declared in certain land in plaintiff's favor. The lower court entered a pro forma decree for the defendants,

confirming the report of Jarvis Varnal Beach, Esq., referee.
Plaintiff appeals.

AFFIRMED.

For appellant there was a brief by *Mr. Cicero M. Idle-man*, with an oral argument by *Mr. Idleman* and *Mr. William P. Lord*.

For respondents Helm and Barger there was a brief over the names of *Masters & Merrick*, and *Cleland & Cleland*, with an oral argument by *Mr. William Y. Masters* and *Mr. John B. Cleland*.

For respondent Perry G. Baker there was a brief and an oral argument by *Mr. Julius C. Moreland*.

Opinion by MR. JUSTICE WOLVERTON.

This suit was instituted November 1, 1894, for the purpose of charging the defendants Cyrus W. Barger and Eliza Helm as trustees of certain lands in Multnomah County, Oregon, for the use and benefit of plaintiff. From the testimony it appears the plaintiff was the wife of John Barger, now deceased, and that Cyrus W. Barger and Eliza Helm are their children. Barger left a will by which he devised and bequeathed to plaintiff all his real and personal property for and during her natural life, or so long as she remained his widow, but in case of her marriage, then a one-third interest absolute in such property. Subject to this provision, the property went to the children in equal portions. The plaintiff and her husband settled in Marion County, near Silverton, in 1847, upon a tract of land entered by them as a donation claim, upon which they lived until 1864. In the meantime Barger was engaged in mining in California and Idaho, in freighting from the Willamette Valley to the mines

in Eastern Oregon and Idaho, and in the flouring mill business at Silverton. He made and lost money in these enterprises, but it is now impossible to tell what was the net result. A house and some lots in Salem, purchased by him while thus engaged, remain as part of the assets of his estate, and were appraised as such at $1,000. The consideration named in the deed, however, is $4,005, but it is highly improbable that they were worth that amount, and it is difficult to determine from the evidence what their real value was when purchased. In the early part of 1866 the plaintiff and her husband sold their donation land claim, or rather what remained of it, for $2,000. With the funds derived from this source, Barger purchased an interest in a ferry at Salem. Whether he invested other funds with it is by no means certain. He operated the ferry until September, 1867, when he sold out. The sum realized is put by witnesses at from $2,500 to $4,500. Out of these funds Barger paid a note which James Smith, the father of plaintiff, held against him for about $1,400. In the spring of 1868 he purchased about 115 head of cattle, at a cost of something like $1,955, and borrowed a thousand dollars to enable him to pay for the same and defray the expenses of driving them to eastern Washington. There is, however, some dispute as to the amount of this last loan, which was also had of James Smith. The defendant R. W. Helm, the husband of Eliza, bought cattle at the same time, and he and Barger took their families and cattle to Klickitat County, Washington Territory, in July of that year. In 1869 Barger and Helm formed a partnership in the cattle business, each putting in his individual stock, and in the adjustment of such assets there was an excess due Helm of about $1,200. About February, 1871, they made a sale to Phelps & Wadleigh, out of which Barger realized, after payment of said excess, and expenses and debts incurred

in the business, about $7,500. Two thousand of this was applied in payment of a balance due on his note to Seth Smith, a brother of plaintiff, given some time previous to the purchase of the ferry. In June, 1871, Barger bought ten acres of the land in dispute for $1,300, and in July the remaining twenty acres at a consideration of $3,100, and took deeds therefor in his own name. The funds from the sale of cattle being a little short of enough to pay for the two tracts and meet some other expenses, some few hundred dollars were borrowed from Jennings Smith, another brother of plaintiff. In 1872 Barger and his wife, having in the meantime left Klickitat, returned thereto and made their home there until 1884, when Barger was adjudged insane, and the plaintiff was appointed his guardian. Her account in January, 1886, shows his estate in Washington to have been worth nearly $10,000. She takes credit therein for expenditures of $3,545.85, reports $3,322.82 on hand to be loaned, and values the real estate at $2,000.

In 1865 Simeon Jennings, an uncle of the plaintiff, died in West Virginia, leaving a large estate to numerous relatives, and from this source and from her father's estate the plaintiff received a considerable sum of money, which was paid to her from time to time, ranging from the fall of 1867 down to a time subsequent to the purchase of the land in dispute by Barger. She claims to have received two payments amounting to about $900 from her uncle's estate prior to the purchase of the cattle, which is probably correct; and to establish the trust relations she claims that one-half of the proceeds of the donation land claim was her money, and this, she testifies, was invested in the ferry by Barger with her consent; that he expended in payment of his debts all the proceeds of the sale of the ferry except $1,000, and that this sum, together with the $900 received from Simeon Jennings'

estate, was at that time, with her consent, invested in the
cattle; that no partnership ever existed in the cattle busi-
ness between Barger and Helm; and that from the pro-
ceeds of the cattle, together with a small sum borrowed
by Barger from her brother, the land in dispute was pur-
chased, all with her consent.  It is probable that her
money repaid the amount borrowed by Barger with which
to purchase the cattle, that it contributed in part to the
expenses of the cattle business, was used to pay a con-
siderable  portion of the $3,000 note of Barger to her
brother Seth Smith, and to repay the money borrowed to
make out the purchase price of the land.  No other direct
use of her money can be traced.  In answer to interroga-
tories, she testified concerning the purchase of the cattle
as follows:  "Q.   What was the agreement and under-
standing between you and your husband at that time?
A.   The understanding was this:  It was my money, and
I gave it to him to invest in cattle hoping he might make
a profit out of it, and he could get out of debt, and we
could have something left for me.   Q.   Anything said
about what interest he was to have in the cattle?   A.
No, sir; there was nothing said about it.   Q.   Anything
said about your interest?   A.   Nothing.   Q.   Anything
said about how he was to get any benefit out of it?   A.
Nothing.   Q.   Your idea was that the money was to be
handled for the good of the family?   A.   It was more for
the good of myself.   Q.   It was really to get Mr. Barger
out of debt, and help the family along?   A.   .I do not
know whether there was anything said about that.   We
went up there partially on Willard's account; we thought
by buying cattle it would give him a start and something
to do, and we might make something for ourselves."   She
further testified, touching the purchase of the land:  "Q.
Was there anything said between you, or by you to him,
about what kind of an investment you preferred to have?

A.   Yes; we talked that over and he asked me what I wanted done with my money, and I said the best thing is to first pay your debts, and we can decide what to do with the remainder later on.   After we went to the Waldo Hills, where my brother Jennings Smith lived, we talked it over, and before we left the Yakima country, I said it would be the best plan to put the money in the bank until we decide, so part of the money was left in Portland, reserving enough to pay that debt to my brother Seth.   *   *   *   We finally decided to buy some land, although land was high, but we thought it safer.   He came to Portland, and he wanted me very much to come, but I did not feel very well and did not feel able to ride on  horseback  that far, so he came down himself, and with my permission he bought one piece of land, although the land was very high."   She relates that a similar conversation attended the second purchase.

In support of her claim it was argued that Barger was practically bankrupt at the time he purchased the cattle, and testimony is adduced touching admissions made by him from time to time to that effect, and to the further purport that the money with which he bought the cattle and the land belonged to his wife.   We have stated the case thus far as strongly for the plaintiff as the facts will admit.   Her testimony is weakened somewhat by the fact that her husband's will received her approval when made, and by the further fact that in September, 1891, she instituted another suit to declare this trust, based at that time upon an alleged express agreement and understanding that the property so purchased in his name should inure to her sole use and benefit.   Other circumstances might be enumerated having the same tendency, to which it is not deemed important to refer.   It is quite certain that the money borrowed by Barger from plaintiff's father was used in the purchase of the cattle, and it is likely that

the balance of the purchase price was supplied from the unexpended ferry money, rather than from the funds received by plaintiff from her uncle's estate.

The plaintiff by the present suit seeks to establish what is claimed to be an implied trust, but it is not clear from the contention of counsel whether they regard it as a resulting or a constructive trust. Although often confused by the authorities there is a marked distinction between the two, and this case furnishes a fair illustration of the distinction. As is said in *Thomas* v. *Stanford,* 49 Md. 184: "There is, perhaps, no principle more clearly settled by numerous authorities than that if a husband purchases an estate with the money of his wife there is a resulting trust, and the husband holds the property as trustee for the benefit of his wife." This court has applied a similar doctrine: *Springer* v. *Young,* 14 Or. 280 (12 Pac. 400). But if the transaction is secretly done in violation of a fiduciary duty, the trust would be constructive rather than resulting. This latter is sometimes denominated a trust ex maleficio: 2 Pomeroy's Equity Jurisprudence, § 1037, note 1, p. 610; and 1 Pomeroy's Equity Jurisprudence, § 155. As applied to this case, if the plaintiff would prevail by the establishment of a trust of the latter kind, she must first establish a fiduciary or trust relation existing between her and her husband at the time of the purchase of the lands, as respects the funds which constituted the consideration therefor. That is to say, that some duty towards her had been assumed by the husband respecting these funds, which must have been the plaintiff's, and that the purchase of the lands and the taking of the title in his name was in violation of the trust; in other words, that he acted in bad faith towards her, either in using her money in the manner designated, or in taking the title in his individual name when he ought to have taken it in hers; for if there was an express

understanding or agreement that he should purchase lands with her funds and take the title in his name, there would be an express trust, but it would be within the statute of frauds, and she could not establish it, there being no conveyance or other instrument in writing subscribed by the party creating or declaring the trust: Section 781, Hill's Code; *Cooper* v. *Thomason*, 30 Or. 161 (45 Pac. 297, 298); *Beecher* v. *Wilson*, 84 Va. 813 (10 Am. St. Rep. 883, 6 S. E. 211). It is a trite saying that money has no earmarks, but it is authoritatively settled that, when once impressed with a trust, it may be traced in equity into whatsoever form it may assume, wherever and whenever it is capable of being identified and distinguished. And the right of following trust funds into the property substituted for them, and impressing it with the primary trust, ceases only when the means of ascertainment fail: *Ferris* v. *Van Vechten*, 73 N. Y. 120. Such means of ascertainment may fail, however, "when the subject-matter is turned into money, and mixed and confounded in a general mass of property of the same description": 2 Story's Equity Jurisprudence, § 1259. It may be stated, also, as a settled principle of law, that in order to establish a resulting trust the evidence must be strong, clear, convincing, and indubitable, touching the fact of payment by the alleged beneficiary, or for or in his behalf: 2 Pomeroy's Equity Jurisprudence, § 1040; *Sisemore* v. *Pelton*, 17 Or. 546 (21 Pac. 667); *Lee* v. *Browder*, 51 Ala. 288; *Westerfield* v. *Kimmer*, 82 Ind. 369; *Murphy* v. *Hanscome*, 76 Iowa, 192 (40 N. W. 717). And when a payment of a part only is claimed, it must be shown in the same clear, concise, and unequivocal manner, the exact proportion of the whole price actually paid, and that the payment was made for some specific part or distinct interest in the estate: 2 Pomeroy's Equity Jurisprudence, § 1040; *Cutler* v. *Tuttle*, 19 N. J. Eq. 561; *Olcott* v. *Bynum*,

84 U. S. (17 Wall.) 59; *Baker* v. *Vining*, 30 Me. 127 (1 Am. Dec. 617); Browne on the Statute of Frauds, § 86. So it is, also, as respects constructive trusts—the evidence that the purchase was made with trust funds must be clear and unmistakable: 2 Pomeroy's Equity Jurisprudence, § 1049. And a trust of either description must arise, if at all, at the time of the conveyance, and the money or other consideration for the deed which is the foundation of the trust must then be paid or secured to be paid: *Taylor* v. *Miles*, 19 Or. 553 (25 Pac. 143); *Beecher* v. *Wilson*, 84 Va. 813 (6 S. E. 211, 10 Am. St. Rep. 883); *White* v. *Carpenter*, 2 Paige Ch. 238; *Niver* v. *Crane*, 98 N. Y. 47; *Westerfield* v. *Kimmer*, 82 Ind. 369; *Appeal of Cross*, 97 Pa. St. 474; *Botsford* v. *Burr*, 2 John. Ch. 408; *Midmer* v. *Midmer*, 26 N. J. Eq. 302.

These principles governing the establishment of implied trusts such as we are considering are in strict accord with the essential nature of the trusts themselves. The fund, or other form of property which it is sought to trace into a different form, does not lose its identity, while it may change in semblance, as, if a sum of money is expended for a parcel of land, or a band of cattle exchanged for stock in a bank, the property form is changed, but the identity of the original form is traceable and distinguishable. The same may be true where several parties have contributed in aliquot parts, the relative proportion in the changed form of the property may be traced and distinguished. That which was the property of the cestui que trust in the first instance continues to be his property in equity throughout all its metamorphoses, but when the identity is lost the trust escapes: See *Perry* v. *McHenry*, 13 Ill. 227, 228; *Niver* v. *Crane*, 98 N. Y. 47. It is, therefore, the entire ownership, speaking in an equitable sense, that must be established, and not some equitable lien upon the changed form of property;

and, if established, the cestui que trust takes the property thus identified, not that his demand be satisfied out of it. Hence it is that payments made in common by the one asserting the claim and the alleged trustee, unless made in aliquot parts; or payments made out of commingled and indistinguishable trust funds, do not evidence a resulting or constructive trust, simply because the identical property is not traceable or recognizable in its changed conditions. It cannot be said that the cestui que trust is the equitable owner of the new form of property: *Cutler* v. *Tuttle*, 19 N. J. Eq. 561; *Ferris* v. *Van Vechten*, 73 N. Y. 120; and Browne on the Statute of Frauds, § 86.

With these premises let us ascertain whether the plaintiff has established either a resulting or constructive trust. The first step in the consideration is the purchase of the ferry. This was probably bought with the joint funds of the husband and wife, and of equal proportions, derived from the sale of the donation land claim; and, as their relative rights stood while the husband held the legal title to the ferry, she may have been entitled to have had a trust declared in her behalf in and to an undivided one-half of this property, had it not been that she consented to the purchase with her funds, and presumably to the taking of the title in her husband's name. Such being the case, it is questionable whether or not they did not attempt the establishment of an express trust, and the trust not having been declared in writing was within the statute of frauds, and not provable. But, it is contended that if Barger purchased the cattle with plaintiff's money, or if he acted as her agent in making the purchase and in transporting them to eastern Washington and caring for them, using her money for the purpose, then the land, having been purchased with the proceeds of the cattle, belonged to her in equity—that

is, as to such land he was her trustee. This conclusion involves both the resulting and constructive phase of an implied trust, seeing that the title was taken in his name. The proposition in either phase may be conceded, but the difficulty lies in the premises. It is not clear that the cattle were bought entirely with her funds, or that any definite, certain, or distinguishable interest therein was so bought—probably not, as it is impossible to determine what aliquot or proportional part of the funds were contributed by her towards their purchase and maintenance upon the range. And it is quite clear that he did not act as her agent either in the purchase or in the management of the stock business in eastern Washington. This latter proposition is evidenced from the fact that he borrowed money upon his individual responsibility with which to contribute towards the purchase, and the further fact that he treated the cattle as his own, with her knowledge and approval, by turning them in as assets of the copartnership formed between him and Helm in 1869. One of the primary purposes of purchasing the cattle, as was testified by the plaintiff, was to give their son, Cyrus W., then quite a young man, a start in business. And this is further evidenced by the fact that he was given a share in their increase for his services in taking care of them.

As a resultant proposition it is urged that taking the title to the land by the husband in his own name, when the consideration paid therefor was the plaintiff's money, made him a trustee of the title for her. But this assumes that the land was purchased with her money. It is true that the purchase was made mostly with the proceeds of the sale of cattle; but, again, the husband borrowed a portion of it upon his individual responsibility. She says the purchases were made with her consent, and she probably knew from the beginning where the title stood.

There is no setting aside or designation of the proceeds of the cattle or any part thereof as her individual money, nor was it so treated; the fact being that part of it was deposited in the bank in the husband's name, and the remainder used in payment of his debts and family expenses. It is not deducible from the testimony that the plaintiff's money was used to pay for the land. If it was, she consented to its use for that purpose, and from the whole course of their dealing it is quite apparent that she consented to his taking the title in his own name, and she is not now in a position to charge his devisees as trustees of the title for her use and benefit.

The course of dealing between the plaintiff and her husband has been about this:  The husband has, with the wife's consent, used her funds in conjunction with his own in the promotion of his business. The funds of each have been so used that they became indistinguishably intermingled and confused, but the business carried on and prosecuted with their joint funds was clearly the business of the husband. This is manifest from the fact that the title of every piece of property, whether real or personal, purchased or obtained during their married life was .taken in his own name, and while held was treated by both parties, so far as we are advised, as his property. Under these conditions it is impossible for the court to trace any particular funds of the plaintiff into the lands in dispute, or to say that the lands represent her funds, and, as a result, cannot declare the trust. There is no doubt but that she has contributed in a large measure to the promotion of her husband's business, but the money furnished by her with that end in view must be regarded as a loan rather than the imposition of trust obligations upon him. They were apparently quite prosperous, having together accumulated a comfortable estate, and, while it may be conceded that the plaintiff

ought to be in some manner reimbursed for such use of her funds, it is clear that we cannot give her relief in this proceeding. The decree appealed from will therefore be affirmed, and the defendants' costs in this court taxed to plaintiff.

AFFIRMED.