Argued October 10; reversed December 12, 1945;
rehearing denied January 29, 1946

# FOX *v.* MAURER ET AL.
### (164 P. (2d) 417)

Before Rossman, Acting Chief Justice, and Bailey, Lusk, Brand and Hay, Associate Justices.

*Frank S. Sever,* of Portland (E. J. Claussen, of Tillamook, on the brief), for appellant.

*Henry E. Perkins,* of Klamath Falls, for respondents Maurer.

*George P. Winslow,* of Tillamook, for respondent Frank Fox.

ROSSMAN, J.

This is an appeal by the plaintiff from a decree of the circuit court in favor of the three defendants. The purpose of the suit is to secure a decree determining the ownership of a tract of real property described in the complaint. The record title to the property was conveyed to one John Fox by a warranty deed October 3, 1919. Two weeks later he and the plaintiff were married. They remained husband and wife until his death April 10, 1944. May 14, 1932, two vendees, who had covenanted four years previously to purchase the property, executed and delivered a quitclaim deed which described the property and named as the grantees both Fox and his wife, the plaintiff. In her efforts to establish title in herself, the plaintiff advances two propositions in alternative form. The first is that she gained a half interest in the property through the medium of a resulting trust which she says was created concurrently with her husband's purchase of the property two weeks prior to the marriage. The second is that she and her husband, by virtue of the aforementioned quitclaim deed, became owners of the property through a tenancy by the entireties and that she, as surviving tenant, is now sole owner.

The defendants deny that the plaintiff possesses anything more than a life estate in the property. The life estate was bequeathed to her by the will of her deceased husband, with the remainder to the defendant, Mary Fox Maurer, a niece of the decedent. Harold Maurer, a second defendant, is the husband of Mary Fox Maurer, Frank Fox, the third defendant, is the executor of the last will and testament of John Fox. Neither Harold Maurer nor Frank Fox claims any interest in the property except by virtue of the cir-

cumstances just indicated. Mary Fox Maurer, Harold Maurer and Frank Fox are the respondents.

The issues before us are: (1) whether or not the evidence establishes with the required degree of cogency facts of the kind essential to the creation of a resulting trust; and (2) whether or not the aforementioned quitclaim deed, which was delivered to two grantees, in one of whom (the husband) there was already vested the record title to the property, created an estate by the entireties. The plaintiff, in support of her contention that a resulting trust arose October 3, 1919, when the warranty deed was delivered to Fox who, two weeks later, became her husband, contends that she defrayed one-half the purchase price of the property. She concedes that only Fox made a payment upon the purchase price October 3, 1919.

We now turn to the evidence. It is free from contradiction. The testimony came from the plaintiff and three witnesses called by her. There is further proof in the form of eleven exhibits, one of which is the sole item of evidence produced by the defendants.

The evidence indicates that the plaintiff and John Fox became acquainted in 1905. October 18, 1919, when the plaintiff was thirty-seven years of age and Fox was sixty, they were married. When they agreed to marry, each possessed an estate worth several thousand dollars. Fox's consisted of a parcel of real property which he sold immediately prior to marriage for $7,000. Later he received $500 cash from his brother. The plaintiff's property consisted of a sum of cash in excess of $2,000 and an interest in the estate of her deceased father. After the marriage she sold her interest in the estate to her brothers and received $6,568.22. A part of that sum was interest that came to her because her brothers paid her in annual install-

ments. Thus when all sums are accounted for, the plaintiff brought into the union $8,568.22, and her husband, $7,500.

Forming a part of the hopes and plans of the couple as they contemplated marriage was a purpose to own a home, seemingly a dairy farm. After the plaintiff had testified that they had discussed the matter of marriage "for several years" and that they had "gone together a number of years," she was asked:

"In your discussions about marriage had you talked about a home?"

She answered:

"Always."

Some time before they were married they found the property described in the complaint. It is a dairy farm, 79 acres in extent at the present time, for which the owner demanded $21,000. According to the plaintiff, she and Fox, in discussing their plans for acquiring a home, had planned to discharge its purchase price in the following way:

"We had decided to put—he said he would sell out to his brother, I would sell out to my brothers, and we would put our moneys together."

Two weeks before the marriage Fox purchased the dairy farm. Immediately before so doing he sold the property which he had previously owned for $7,000 and handed that sum to the vendor of the farm as the initial payment. He possessed no other funds. He evidenced the balance of the purchase price, $14,000 with thirteen promissory notes secured by a mortgage on the farm. The first of the notes was in the denomination of $2,000; the other twelve were each in the amount of $1,000. The $2,000 note was rendered

payable in two years; the others in succeeding one-year periods. All of them bore six per cent interest. The deed to the property named Fox as the grantee.

About the time that Fox bought the property, the plaintiff and he went to Portland and selected the furnishings for the house which stood upon the farm and into which they moved after their marriage. Payment of the purchases was made out of the cash aggregating more than $2,000 which the plaintiff possessed at that time. Then the marriage took place and the couple moved upon the farm. At the same time the plaintiff deposited the balance of her money in a local bank in the joint names of herself and Fox. She said the deposit "didn't amount to quite two thousand dollars." In the months that followed both she and her husband made deposits in the account and drew checks against it. The account was continued until Fox's death. Neither possessed any other bank account. The plaintiff, counsel for all parties and the briefs refer to the account as a "joint account." For instance, the respondent's brief, referring to the account, says:

"There was a joint checking account established by the appellant and John Fox after the marriage. To it both contributed and checked out at will."

What, if any, agreement with the bank may have been signed when the account was opened has not been disclosed. But, since the plaintiff and all counsel refer to the account as a "joint account", we shall deem that such was its nature. When the account was opened, Fox possessed no cash. All of his money was exhausted in making the initial payment upon the property. Since the couple moved upon the place in the late fall, the farm itself yielded no material income for some months,

and thus the money which the plaintiff deposited in the bank was virtually all that they had. Checks were drawn against it for living expenses as well as for the purchase of cows, horses and other things that were needed to stock the farm so that it yould yield an income.

When Fox, some time after the marriage, received from his brother the sum of $500 he deposited it in the joint account, and the plaintiff, as she received installments and interest money aggregating $6,568.22 from her brothers, placed all of it in the same account. The entire income from the farm was put in the account. Against the latter checks were drawn, not only for all of the items which we have already mentioned but likewise for payment of the balance of $14,000 of the purchase price of the property and the required interest.

Seemingly, husband and wife bore to each other something of the relationship of co-partners. We observed that the plaintiff, in narrating the life of toil which each devoted to the place, said: ''We managed it together, he always talked over everything with me.'' According to her, there was scarcely anything left at the end of the year after all obligations, including the annual purchase money notes, had been discharged, and hence they had nothing for pleasure. They possessed no automobile until two years prior to the husband's death. In the meantime, they got along with their farm truck. Both truck and automobile were paid for out of the joint bank account.

It was in the above manner that the property was purchased, operated and paid for. If the plaintiff's testimony concerning the purpose of the two in buying this property is true, it is easy to understand why the

deed named only Fox as grantee; at the time of the purchase the two were not married.

We now take from the testimony given by the plaintiff excerpts wherein she indicated the manner in which title to the property was to be held.

"Q. Was anything said about how you should acquire that property?

"A. You mean own the property?

"Q. Yes.

"A. I requested my name on the deed when I started to put my money into the place.

"Q. When was that?

"A. Well, when we were first married.

"Q. That was after you were married?

"A. After we were married, and he always told me that everything was all right, and, naturally, I believed my husband."

Shortly the plaintiff was shown the deed which named only her husband as grantee. Then she was asked:

"Q. When did you first see that deed, Mrs. Fox, do you remember?

"A. I think soon after we were married; that is when I requested my name be put on the deed. I said that settled everything; he always gave me the impression that my name was on the deed, even up to just a few months before he died it came up, we had a talk about it.

"Q. Did you expect your name to be put on to this very same deed?

"A. I sure did. That is why he had never talked to me because he knew what I expected.

"Q. When did you talk to him last about it?

"A. Well, it must have been around in February of this last year.

"Q. Of this year?

"A. Yes."

It is clear from the course of the examination that

when the plaintiff said, "I requested my name be put on the deed" and "he always gave me the impression that my name was on the deed" she meant the very instrument which was executed October 3, 1919, and which described the property involved in this suit.

February 28, 1923, a little more than three years after the marriage, the couple purchased for $2,500 a tract of four acres adjacent to their dairy farm and made it a part of the latter. The price was paid out of the joint bank account. The deed named as grantees both husband and wife. In addition to the four-acre tract, the couple bought a house and lot in Cloverdale for $650, the title to which was also taken in their joint names. Its purchase price was discharged out of the joint bank account.

We shall now indicate the precise times that the couple needed money with which to discharge purchase money obligations, and also the times and manner in which the plaintiff received her money, that is, the sum of $8,568.22, which she says went into the property.

Since the couple purchased the four-acre tract February 28, 1923, at a price of $2,500, it must have been necessary for them to have had that sum on hand at that time. We have mentioned the fact that the unpaid balance of $14,000 of the purchase price of the dairy farm was evidenced by thirteen promissory notes. The first of them, in the denomination of $2,000, came due October 3, 1921. The other twelve, each in the denomination of $1,000, were payable one each in the years succeeding 1921. It will be recalled that the plaintiff had on hand more than $2,000 cash when Fox purchased the dairy farm and that every dollar that was not paid for furniture was deposited in the joint account. The sum which she put in the bank was a little less than $2,000. Soon there was checked out of the

account the purchase price of the cows and equipment needed to make the farm yield an income. When income began to manifest itself it also was deposited in the bank. Every dollar in the bank which was needed for living expenses and costs of operation was available for the discharge of purchase money obligations. The money which the plaintiff received from her brothers for her interest in her deceased father's estate was paid to her in the amounts and at the times following:

| | |
|---|---|
| January 22, 1921 | $ 300.00 |
| December 26, 1921 | 1,060.00 |
| January 21, 1922 | 240.00 |
| December 21, 1922 | 1,240.00 |
| December 25, 1923 | 180.00 |
| December 30, 1925 | 1,180.00 |
| January 4, 1927 | 120.00 |
| February 6, 1928 | 1,128.22 |
| December 30, 1928 | 60.00 |
| January 3, 1930 | 1,160.00 |

All of those sums, as already indicated, were deposited in the joint bank account. In fact, the plaintiff testified that the sums were "turned in on the place; I turned them to John and he come to Tillamook and paid the notes off, whatever was due." By "the notes" she meant her husband's purchase money notes.

From the above schedule it will be observed that the plaintiff's receipts from her father's estate came at the time when the money was most needed to discharge the debts created by the purchase of the properties.

In 1928 E. W. Wilkinson and his wife contracted to purchase the dairy farm and the four-acre tract for the sum of $26,000, payable $4,000 cash and the balance in installments of $500 annually. Unpaid balances bore six per cent. interest. In obedience to their contract, the Wilkinsons paid the initial payment of $4,000,

three installments of $500 and the required amount of interest. The total was $9,280. All of that money was deposited in the joint bank account, a circumstance adverse to the defendants' contention that Fox was sole owner of the property.

Mrs. Wilkinson, as a witness, testified:

"We wrote our checks out to John and Mollie Fox—we always made them out that way."

The plaintiff was known to her intimates as Mollie.

Mrs. Wilkinson also testified:

"We paid the taxes in the name of John and Mollie Fox."

Those are circumstances which are also adverse to the respondents' contentions.

May 14, 1932, the Foxes and the Wilkinsons voluntarily rescinded the contract of purchase. By that time the aforementioned sums had been paid. The plaintiff, as well as her husband, participated in the rescission negotiations. The terms of the rescission required the Foxes to pay the Wilkinsons $2,500 and the Wilkinsons to execute a quitclaim deed. From the latter, as executed by the Wilkinsons, we quote:

" * * * in consideration of Twenty-five hundred and no/100 Dollars to them paid by John Fox and Mollie Fox, husband and wife, do hereby remise, release and forever QUITCLAIM unto the said John Fox and Mollie Fox"

the property described in the contract of purchase. In turn, the Foxes paid to the Wilkinsons the sum of $2,500 through the medium of a check drawn against the joint bank account. According to Mrs. Wilkinson, it was Fox himself who presented to the Wilkinsons

for signature the deed which named as the grantee, not only Fox, but also his wife. She testified: "Mr. Fox brought it down to us." When she was asked whether any discussion had preceded the drafting of the deed, she answered: "It was discussed at the bank it should be made out to John and Mollie Fox." This quitclaim deed is the instrument upon which the plaintiff relies to show that she and her husband owned the property as tenants by the entirety.

October 1, 1939, seven and one-half years after the execution of the quitclaim deed, the property was leased to one Constantin Peters. The lease did not bear the plaintiff's name. Likewise, it did not include the cows which constituted a part of the dairy. Peters purchased the cows outright and paid for them $2,650. The latter was deposited in the joint account. Before the lease was executed the plaintiff's husband consulted her, which circumstance, together with the fact that the purchase price of the cows was deposited in the joint account, is an indication that Fox recognized his wife's interest.

While the Foxes were living upon the property they improved it by the construction of a barn and by enlarging the house after moving it to a different location. The expenses of these improvements were discharged from the joint bank account.

James E. Blackburn testified that he worked upon the place "for John and Mollie Fox" in the period "from '22 to '23, and in '32, shortly after they took the place back from Wilkinsons." He swore that while he and Fox were toiling in the field, Fox said "he had a pretty hard time making it there until after he and Mollie were married; she had sold her place down at Meda."

"Q. Anything more than that?

"A. After that he said she had put her money in the place and they got along a little better."

It seems that the couple, in addition to purchasing the dairy farm, the four acres and the house and lot in Cloverdale, bought another piece of property which they "owned about three years and then sold." Upon cross-examination, the plaintiff was asked:

"Did you use that property to make any investments of any kind except for the farm that you owned?"

She answered:

"No, we just put it all back on to the place.

"Q. In what way did you put it back?

"A. Well, in improving different ways."

It is thus evident that the couple gave the best they had during their married life to the dairy farm. It represents the result of their thrift and toil.

The above, we believe, is a sufficient review of the evidence. It includes reference to all exhibits which mentioned facts material to the issues.

The evidence above reviewed is free from contradiction. Neither the plaintiff nor any of her witnesses was impeached or contradicted. The defendants' brief says: "Note at page 12 of Trans. how reluctant appellant was to admit she received balance of $2,000 in joint account at time of her husband's death." We, therefore, quote from page 12 of the transcript of testimony, being cross-examination of the plaintiff:

"Q. Well, now, that joint checking account continued then from the time you were married until your husband's death?

"A. Yes.

"Q. Was there any balance in it at that time?
"A. Yes.
"Q. At the time of his death?
"A. Yes.
"Q. How much was that?
"A. Well, is that anything—do I have to tell?
"Q. Yes, that is the way—what was there at the time of his death?
"A. Do I have to tell that, Mr. Claussen?
"Mr. Claussen: Yes.
"A. Well, it was close to two thousand dollars."

We discern nothing in this incident which leads us to believe that the plaintiff was discredited when she faltered in the above-disclosed manner. Rightly or wrongly, most people deem their bank accounts as peculiarly personal and desire them to be sequestered from the prying eyes of others. Moreover, most housewives view with misgivings the witness stand and especially cross-examination. It is a matter of frequent observation that when a line of inquiry propounded by a cross-examining attorney seeks to lay open matters previously deemed peculiarly personal, even the most frank of witnesses will recoil. It seems to us that this incident indicates nothing more than that the witness is a woman. All of the rest of her testimony appears to be candid and truthful. It was generally the plaintiff who wrote the checks which discharged the couple's obligations. The unostentatious pride with which she stated that she and her husband met promptly all of their obligations, even though it involved the sacrifice of pleasures, indicates to us that she, at least, must be a person of character, possessed of a strong sense of responsibility. Character which commends one to a bank is not without value on the witness stand.

In view of the above circumstances, we know of no reason for withholding from the above-reviewed evidence full potency.

We are certain that the evidence does not indicate that the plaintiff, by permitting her money to go into the purchase price of property, the title to which was vested in her husband, intended to make him a gift of her funds. The making of a gift, we are satisfied, was never any part of the plaintiff's plans. We are also convinced that Fox did not think that his wife was making him a gift of her money. We accept as truthful the plaintiff's testimony that her husband led her to believe that her name had been inserted in the deed as a grantee. Therefore, she thought that she was a part owner of the property as her money was applied upon (a) its purchase price, (b) the cost of furniture, livestock and equipment, (c) the expense of improvements to the property, and (d) the household expenses until the farm earned an income. Moreover, before her money was used for the above purposes (except for the purchase of the furniture) it was first deposited in a joint bank account. The status of this account as a joint bank account is not questioned by anyone. It seems clear that both husband and wife, in putting their money into the account, thought that their funds were jointly owned. Those inferences on our part are warranted by *State v. Gralewski's Estate* 176 Or. 448, 159 P. (2d) 211, and by the authorities therein cited. Thus, approximately two-thirds of the purchase price of the property was discharged with funds taken from the bank account which, in turn, was owned equally by husband and wife.

The evidence warrants a belief that the plaintiff and Fox had two purposes in mind in the fall of 1919.

One was to become married and the other purpose was to purchase a dairy farm. Both individuals had passed by a sufficient margin the romantic age when marriage is contracted purely upon an emotional basis. Practical, financial or economic factors were in their minds. They were thinking not only of marriage but also of a home and a livelihood. The funds of neither, taken by itself, sufficed for the plans which they entertained. Fox had only $7,000 and if it was employed as the initial payment upon the purchase price there would be nothing left with which to stock the farm and meet living expenses. The plaintiff's $2,000 cash would provide the house with furniture and the farm with the needed cows and equipment. Thus a home would be secured, and before long the farm would yield an income. Moreover, something would be left of the $2,000 to tide the couple over until the income was actually realized. Next, through the conversion of her interest in her deceased father's estate into cash, money in sizeable amounts would come to hand which could reduce in part the balance of the purchase price of the farm and the interest thereon. In fact, her money would come in at the very time when the installments, especially the interest upon them, would be the most burdensome. These were the circumstances that confronted the couple in the fall of 1919. We are satisfied that in agreeing to become married they also agreed to pool their financial resources and thus purchase the dairy farm as a joint venture. The promise of marriage, we are certain, was not part consideration for the purchase of the farm. It is true, as the respondents point out, that no written evidence of the agreement concerning the farm was prepared, but we think it is not uncommon for two people who trust one another and whose lives are lived

in simplicity to refrain from reducing their agreements into written form.

The course of conduct which the parties pursued immediately after the marriage took place corroborates the plaintiff's testimony pertaining to the formation of the agreement just mentioned. The corroborating facts are: (1) the couple opened a joint bank account; (2) they deposited in the joint account the income produced by the farm; (3) all except $7,000 of the purchase price of the property was paid out of the joint account; (4) the plaintiff deposited in the joint account everything she received in payment of her interest in the estate of her deceased father; (5) the purchase money paid by the Wilkinsons under their contract of purchase was deposited in the joint account; (6) the quitclaim deed, which was executed after the rescission of the Wilkinson contract, named the plaintiff with her husband as a grantee; (7) the payment for improvements made to the property was made out of the joint account; (8) payment of taxes assessed against the property was made in the name of plaintiff and her husband; (9) the plaintiff was consulted by her husband when the property was leased to Peters; (10) the couple jointly operated the farm; (11) the plaintiff was led to believe, through repeated assurances by her husband, that her name was in the deed; (12) the deed of conveyance to the four-acre tract, which was made a part of the farm, named husband and wife as grantees; and (13) the deed of conveyance to the Cloverdale property named husband and wife as grantees.

From the defendants' brief we quote:

"The case is one of that type where the defendants' witness (in this case, John Fox) is de-

ceased, and the only testimony was and is in possession of plaintiff.''

It will be observed from the facts summarized in the preceding paragraph that the defendants are mistaken in the statement just quoted. The conduct of the parties following their marriage is highly persuasive that the husband recognized that his wife shared with him ownership of the farm.

The memorandum opinion of the circuit judge contains no intimation of a belief that the evidence fails to show that when the property was purchased Fox and his intended wife planned that they should own it together. His conclusion that the evidence failed to disclose the basis for a resulting trust was grounded upon the following propositions:

''A resulting trust must arise, if at all, at the time of the conveyance; * * * The plaintiff and John Fox were not husband and wife when the property was purchased and the plaintiff did not contribute her money to the joint bank account for some time thereafter, therefore, no resulting trust arose at the time John Fox took title to the property. It is a rule of law that when a person claims resulting trust by reason of paying part of the purchase price the amount must be definite and for a specific part of the whole property. * * * It is not enough to show that the plaintiff contributed 'some money' toward the purchase of the property. * * * While it is clear that some of the plaintiff's money went to pay off the indebtedness against this property, the Court is unable to say that any definite amount was used for that purpose.''

■ The above will suffice as an analysis of the evidence. We express the belief that the plaintiff made no gift of her money to her husband; that preceding the latter's purchase of the farm the couple had agreed to purchase the property together and pay for it out of

their joint funds; and that each contributed toward the purchase price of the property.

We now turn to the authorities. We shall first determine whether the fact that the plaintiff made no payment upon the purchase price concurrently with the execution of the deed is fatal to this suit. The following is taken from Bogert, Trusts and Trustees, § 456:

> "In another large group of cases the person claiming a resulting trust proves payment after the delivery of the deed pursuant to a promise made *to the grantee* in the deed before the delivery of the the deed. For example, A is bargaining for land to be bought from B, and A seeks the aid of C in completing the sale. It is agreed that A shall pay part of the price at the time of the delivery of the deed from B to A, that A shall give a bond and mortgage to B for the remainder of the purchase price, and C agrees with A that C will make payments to A in the future which A expects to use to help him in meeting his obligations to B. Here C, the third party, does not promise the grantor, B, anything. The consideration received by the grantor for his deed consists of cash paid by the grantee, A, and a bond and mortgage executed by the grantee, A, alone. C's promise to the grantee, A, is not to pay the purchase price, because one can pay the purchase price technically only to the seller of the land. C's agreement with A is to make a payment to A which will enable A to pay the purchase price."

It will be observed that the hypothetical situation in which Professor Bogert indulges is paralleled by the facts disclosed by the record before us. Professor Bogert continues:

> "If the promise of C has been performed by the making of the agreed payment to A, the grantee, after the delivery of the deed to A, the authorities hold that C obtains a resulting trust, which doubt-

less arises at the date of C's payment, but relates back in its effect to the time of the taking of title by the grantee, A. The courts do not give their reasoning in detail or analyze the situation carefully. It would seem that the result can be justified in either of two ways, namely, (1) by a finding that C's promise to A and his performance of it are equivalent in practical effect to a payment of part of the price of the land at the time of the delivery of the deed; or (2) by an argument that, even if C's conduct is something totally distinct from payment part of the purchase price to the grantor, there is ground for an inference or presumption of an agreement between the prospective grantee and C that C should have an equitable interest in the land corresponding to the amount of his payment to the grantee.''

Professor Bogert's statement is accompanied with citations to the decisions. They adequately support his assertion that a resulting trust arises from the circumstances outlined in his hypothetical case.

From Scott on Trusts, §§ 456.2 and 457, we quote:

''If the property is purchased upon the credit of B, but there was at the time of purchase an oral contract between A and B whereby A is agreed to contribute in part to the payment of B's obligation to the vendor, a resulting trust pro tanto arises. Thus in Fox v. Shanley, land was purchased for $5,500 by a husband and wife. The husband paid $1,900 in cash and the wife paid $1,100 in cash, and a note was given for the balance of $2,500 which was signed by the wife. It was agreed between the husband and wife that he would pay $2,000 on the note and that she would pay the remaining $500. The title to the land was taken in the wife's name, because the husband was busy and it was erroneously thought that a conveyance could not be made unless the grantee was present when the title passed. When the note matured, the husband paid the

vendor $2,000 and the wife paid the vendor $500, as had been agreed between them. It was held that the wife held upon a resulting trust for the husband in proportion to his contribution. In estimating the husband's contribution he was credited not only with the $1,900 cash which he paid prior to the conveyance, but also with the $2,000 which he agreed with his wife to pay upon her note to the vendor, and which he subsequently paid. It was accordingly held that he was entitled in equity to 39/55 of the land. The decision seems sound. * * *

"In order to raise a resulting trust it is necessary that a person other than the grantee prior to or at the time of the purchase should pay or assume an obligation to pay the purchase price. It is not enough that subsequent to the purchase he pays or agrees to pay the purchase price."

Professor Scott cites many decisions in support of of the above statements. In our opinion, the latter are adequately sustained.

Nothing said in any decision of this court cited by the respondents is at variance with the principles given by Professors Bogert and Scott. The decisions cited by the respondents are: *Chance v. Graham*, 76 Or. 199, 148 P. 63; *DeRoboan v. Schmidtlin*, 50 Or. 388, 92 P. 1082; *Barger v. Barger*, 30 Or. 268, 47 P. 702; and *Taylor v. Miles*, 19 Or. 550, 25 P. 143. Illustrative of what is said in those opinions is the following taken from the Taylor decision:

"A trust arising by operation of law must arise at the time of the transaction, and cannot be created afterwards."

The decision does not hold, however, that payment must be made by the beneficiary coeval with the creation of a trust. We know of no decision which holds that a re-

sulting trust will not arise out of facts similar to those outlined in Professor Bogert's hypothetical case.

■ We are satisfied that in those instances where the purchase price of property is not fully discharged at the time of the conveyance, the grantee may be held to be a resulting trustee, even though the claimant paid nothing at the time of the conveyance; provided the claimant, at the time just mentioned, agreed with the grantee that he would pay all or a part of the purchase price; and provided further that he subsequently fulfilled his agreement. Since we take that view, it necessarily follows that the fact that the plaintiff did not make a payment on the purchase price at the time of the conveyance does not preclude a court from holding that she is the beneficiary of a resulting trust.

■ A party who seeks to establish in his favor a resulting trust must submit proof which is clear, strong and convincing. The Restatement of the Law, Trusts, § 458, states the rule in these words:

"Where a transfer of property is made to one person and another seeks to enforce a resulting trust in his favor on the ground that he paid the purchase price, he has the burden of proving by clear and convincing evidence that he paid the purchase price."

In the present case, it is clear that the plaintiff's money went into the purchase price of the property which constitutes the subject-matter of this suit. Although at the moment when the deed was delivered Fox alone made a payment upon the purchase price, he had the agreement of his intended wife that she would sell her interest in her father's estate and apply its proceeds toward payment of the purchase price of the

farm. Thus, in effect, she lent her credit to him and rendered it feasible for him to buy the place.

The memorandum opinion of the circuit court says:

"While it is clear that some of the plaintiff's money went to pay off the indebtedness against this property, the Court is unable to say that any definite amount was used for that purpose."

We have already said that we are satisfied that before their marriage the plaintiff and her intended spouse had agreed to purchase the property as a joint venture. The respondents, however, contend, as they did in the circuit court, that the evidence fails to indicate the specific part of the purchase price of the property which the plaintiff agreed to discharge and the fractional interest in the title which it was contemplated she should have. They cite: *Savage v. Savage,* 163 Or. 26, 94 P. (2d) 134; *American Surety Co. v. Hattrem,* 138 Or. 358, 3 P. (2d) 1109, 6 P. (2d) 1087; *Holohan v. McCarthy,* 130 Or. 577, 281 P. 178; and *Barger v. Barger,* 30 Or. 268, 47 P. 702. The American Surety decision is subject to the criticism that it approves both the aliquot part and the definite interest rules. The two are, of course, different. See Scott on Trusts, § 454, and Bogert, Trusts and Trustees, § 457.

■ The rule which we deem applicable is thus stated in Restatement of the Law, Trusts, § 455:

"Where a transfer of property is made to one person and the whole or a part of the purchase price is paid by another, a resulting trust arises in favor of the person by whom such payment is made although the payment is not made in money, unless he manifests an intention that no resulting trust should arise."

■■ We think that the course pursued by the par-

ties following their marriage and extending to the death of the husband shows that they expected to own in equal shares everything thereafter paid for with their joint funds. Concurrently with the opening of the joint bank account they were uniting their lives and were preparing to share their reverses and fortunes equally. Unfortunately, the plaintiff's testimony does not indicate clearly the terms of the agreement which she and her intended husband effected concurrently with the purchase of the farm, but, as we have indicated, the course which they pursued from that day on renders it clear that they contemplated that each should contribute to the purchase of the farm and that each should share in its ownership. The husband's repeated assurances to the plaintiff, when she asked whether her name had been inserted in the deed, that "everything was all right" satisfies us that he regarded her as a joint owner of the property. Seemingly, through some inadvertence or misunderstanding of title matters, the husband had deceived himself concerning what was needed in the way of title instruments to make the record conform to his intentions. When the couple were married one-third of the purchase price of the property had been defrayed by Fox with money in which the plaintiff had no interest. Concurrently with the marriage, or at least shortly thereafter, the joint bank account was opened. Thereafter every dollar that was applied upon purchase price came out of the bank account. As we have shown, the latter was owned in equal parts by husband and wife. Hence, two-thirds of the purchase price was defrayed out of the money which the two owned equally. We now quote from Scott on Trust, § 454:

"If an express although oral agreement is

proved to the effect that the contributor is to have an interest in the property purchased proportional to the amount of his contribution, he is clearly entitled to such an interest, even though the amount contributed is not strictly an aliquot part of the total purchase price. If he pays a real aliquot part of the purchase price, one half, one third, one fourth, etc., the courts have had no difficulty in holding that presumptively it was intended that he should have a corresponding aliquot part of the property purchased, and he has been held entitled to recover such an interest, even though no other evidence is offered as to the intention of the parties. In most states the courts have further held that where he contributes a part of the purchase price, and it is shown that a loan or gift was not intended, there is a resulting trust for him of an interest proportional to the part contributed by him, although that part is not an aliquot part of the total purchase price, and although no agreement or understanding is shown as to the extent of the interest he was intended to have in the property.''

We believe that the rule just quoted is supported by the authorities and that it is sound. We know of no decision announced by this court that does not conform with that rule. In short, it is our belief that where a contribution is made to purchase price, under circumstances showing that no loan or gift is intended, the contributor is entitled to an interest in the property in the proportion that his contribution bears towards purchase price. That rule is also favored by Professor Bogert in the section of his treatise which we previously cited.

■ Without further discussion, we express our belief that the evidence satisfactorily proves that the plaintiff discharged one-third of the purchase price of this

property under an agreement with the grantee that title should be vested in her to the extent just indicated.

◼ The quitclaim deed from the Wilkinsons to the Foxes failed to create an estate by the entireties because the legal title to the property was already vested in Fox: 26 Am. Jur., Husband and Wife, § 71, p. 698; and Annotation, 132 A. L. R. 630.

◼ The respondents criticize the appellant's brief on the ground that in presenting her contentions her brief fails to comply with Rule 2 of this court, which is set forth in 170 Or. 715, and 9 O. C. L. A. 315. No motion to dismiss was made. Appellant's counsel explained during the oral argument that he did not believe that Rule 2 was applicable to appeals from decrees. He is in error in that belief. The rule is applicable in all kinds of proceedings. Appellant's brief complies with the spirit of Rule 2 and achieves the rule's general purposes. The fracture of the rule consists more in misnaming the assignments of error than in any other respect. A faithful compliance with our rules will facilitate the disposal of appeals.

The plaintiff is entitled to the entry of a decree holding that at the time of the death of her husband she was the owner of a third interest in the property described in the complaint. The cause will be remanded to the circuit court with instructions to enter such a decree.

BELT, C. J., took no part in the decision of this case.