66 So.2d 445

**SIMS v. SIMS et al.**

**4 Div. 725.**

Supreme Court of Alabama.

June 30, 1953.

C. L. Rowe, Elba, for appellant.

J. A. Carnley, Elba, for appellees.

STAKELY, Justice.

The bill in this case is filed for the purpose of establishing a resulting trust in certain lands lying in Coffee County, Alabama, in favor of Mrs. Mary Sims (appellant) and against the heirs at law of her deceased husband, J. M. Sims. The lands are described in a deed made to J. M. Sims as grantee by C. J. Bradley and wife Ollie Bradley on November 13, 1945. The evidence was taken before a commissioner and on submission for final decree the court refused to establish a resulting trust. The appeal here is from that decree.

■ The result is that the appellant seeks to engraft a resulting trust upon a conveyance absolute in its terms. Our cases make it abundantly clear and with good reason that when this result is sought there is a presumption that the conveyance speaks the whole truth and must prevail until the contrary is established beyond reasonable controversy. Banks v. Banks, 253 Ala. 252, 44 So.2d 10. There is no doubt that in cases of the character now under consideration the evidence offered by the complainant must be clear, strong, unequivocal and unmistakable and if proof of the fact of payment is doubtful, uncertain or unsatisfactory relief will be denied. Holt v. Johnson, 166 Ala. 358, 52 So. 323; Rodgers v. Thornton, 254 Ala. 66, 46 So.2d 809; Merchants Nat. Bank of Mobile v. Bertolla, 245 Ala. 662, 18 So. 2d 378; Hooks v. Hooks, 258 Ala.Sup. 427, 63 So.2d 348.

■ We have considered the evidence in this case with great care and like the trial court, we are not satisfied that it is so clear and convincing as to meet the requirements of our cases. It is not practicable to set out all the evidence which tends to make up the factual issue in this case, but we do state enough of the evidence to show the basis of our uncertainty.

The evidence showed that at the time the deed was executed, Mrs. Mary Sims took $1,000 in cash from her purse, $100 being in each of ten separate envelopes, and paid the money, but there is uncertainty as to whether this money belonged to her or was the property of her husband.

Mrs. Mary Sims contends that the money was earned by her from savings made by her when she conducted a store in partnership with her father in Montgomery County and then near Orion in Pike County. When her father died she continued in business with her mother and when her mother died, she operated the store alone. She and her husband, together with her mother and father, occupied living quarters in connection with the store. Her husband, however, was a busy and energetic man. He conducted farming operations, was engaged in performing services as a mechanic in the community and there is evidence tending to show that he was interested in the store.

Before J. M. Sims and his wife moved to Coffee County, they sold the farm in Pike County, which stood in the name of J. M. Sims. When asked about the source of the money which was paid for the property in Coffee County, Mrs. Mary Sims did not know where the money came from, except that she worked for it. Although she said that she sold her place when she moved to Coffee County, the deed in evidence dated August 17, 1945, shows that the property stood in the name of J. M. Sims and that he received $3,000 as the price for the same. Bank books were introduced in evidence which showed accounts in the name of J. M. Sims or Mary Sims. Three Thousand Dollars was de-

posited in the Troy Bank & Trust Company on August 17, 1945 and $1,000 was deposited in the account in the First Farmers & Merchants National Bank on August 17, 1945. When she was asked in reference to the $1,000 paid in cash for the property here involved, "Well, that was yours and his money you had in your pocket book that day, wasn't it?", she replied, "No, that was mine. He had $1,-000.00 and he deposited his and I put mine in the land." When she was asked how much she got from the store, she replied, "I just don't particularly know how much." She further testified with reference to the money which she had in her purse and which was paid at the time the Coffee County property was purchased, "Where did you get that money you had in your purse?", she replied that she worked for it, that she had it a good long while, some of it, that she didn't know how long she had carried the money in her purse and she carried it with her when she left home and when at home she just left it in her room. She further testified that nearly $2,000 was later spent in constructing the dwelling and store on the land bought from the Bradleys. She called this money "mine and his" that "she worked for it" and that it was "both our money".

The testimony indicates that the farm and store were sold and the proceeds thereof deposited except for the $1,000 which was used to buy the place from the Bradleys. None of the money deposited with the Troy Bank & Trust Company to January 1951 was drawn out. The other account showed withdrawals of $400 each on June 10, 1946 and on August 14, 1948. In other words it does not appear to be certain that any money belonging separately to her was traced into the purchase of the land.

In the case of J. A. Owens & Co. v. Blanks, 225 Ala. 566, 144 So. 35, 36, this court said:

"A resulting trust, the holding of title by one with beneficial ownership in another, is a creature of equity, based upon the prima facie presumption that he who pays the whole or an aliquot part of the purchase price for lands becomes the beneficial owner. The doctrine does not rest on an express, but on an implied, agreement, by which the title is taken in the name of another as matter of convenience. No tort or breach of duty is involved in this form of trust. The conveyance, as made, may be in keeping with the common purpose of all parties."

In view of the uncertainty as to whose money was used to pay for the Coffee County land, we also set out evidence which showed in substance the following.

Mr. J. C. Fleming, an attorney, was asked to prepare the deed. Both J. M. Sims and the appellant Mrs. Mary Sims were in his office at the time. He asked what the initials of Mr. Sims were. Nothing was asked concerning Mrs. Sims, nor was anything said about her name being in the deed.

Mrs. Mary Sims upon being asked if she told Mr. Bradley that she wanted her name in the deed, answered, "No, I didn't", that she did not tell Mr. Fleming or Miss Walker, the latter being the notary public who took the acknowledgments of the deed. About the signing of the deed she was asked, "You knew that Mr. and Mrs. Bradley signed the deed to your husband, J. M. Sims, to the land didn't you?" and she replied at first, "I never paid any attention", then, "Well, I guess so, because I always when I bought or sold I used J. M. Sims as buying and selling always," and finally when asked again, "You knew then that J. M. Sims's name was in the deed as purchaser?", she answered, "Yes".

We consider the fact that Mrs. Mary Sims knew that the property purchased in Coffee County was being taken in the name of her husband, J. M. Sims, increases the uncertainty as to the common purpose of Mrs. Mary Sims and her husband. If the money paid for the land in Coffee County was clearly hers, then under the foregoing authority, the fact that the deed was made to her husband, would not prevent the establishment of a resulting trust, but where there is uncertainty as to whose money paid for the Coffee County lands, then the fact that Mrs. Mary Sims stood idly by and allowed the deed to be made

to her husband, adds to the uncertainty, which is another way of saying that where there is uncertainty of purpose, a resulting trust will not be established.

Like the trial court we feel that the proof offered by the complainant does not comply with the strict requirements of our cases of this kind. Accordingly we feel that the decree of the lower court is due to be affirmed.

Affirmed.

All the Justices concur.