185 So.2d 137

**Peter N. CHERPES**

v.

**Hariklia CHERPES.**

**6 Div. 154.**

Supreme Court of Alabama.

March 31, 1966.

Beddow, Embry & Beddow and Roderick M. MacLeod, Jr., Birmingham, for appellant.

Rogers, Howard, Redden & Mills and Jerry O. Lorant, Birmingham, for appellee.

HARWOOD, Justice.

This is an appeal from a decree establishing a constructive trust in an undivided one-half interest in an apartment building and decreeing that an undivided one-half interest in said apartment building be vested in the complainant as of the purchase date, 26 August 1948. The court further referred the cause to the Register for an accounting as to rents and profits received from said apartment building by the respondent since date of its purchase to the date of the decree, and that said accounting shall include interest at 6% from 31 May 1962, upon the undivided one-half interest declared to be in the complainant, not to include that portion of the proceeds applied to the payment of the mortgage on the apartment building.

The cause was reserved by the court for further orders upon the report of the accounting from the Register.

The complaint below was filed on 21 June 1962. It averred that from 1940 until 1948, the complainant and respondent were

husband and wife; that they both worked and earned and jointly saved sums of money which they treated and recognized as being their joint property and that these savings were the product of earnings of each, and that these joint monies and savings were used to purchase the apartment building in question, said apartment building having been purchased on 26 August 1948; that at the time the apartment building was purchased the complainant and respondent agreed that they would take their joint savings and accumulation of money and make a down payment, and from rentals from the apartments they would pay the balance due.

The bill further averred that the complainant and respondent delivered to the sellers of the apartment building $9,000 as down payment which sum was the joint property of the complainant and respondent, earned by them jointly.

The complaint avers that at the time of the execution of the deed to said apartment building, title of said building was taken in the respondent, the complainant at all times during their marriage having trusted and permitted the respondent to manage and in all manner control the joint properties and monies accumulated by them; that the complainant and respondent had an agreement between themselves and at all times treated the purchase of the apartment building as a joint venture, and that said purchase was for the purpose of providing for them a livelihood for their future life and through their old age together.

It is further averred that complainant and respondent jointly worked around and maintained . said apartment building and eventually paid the mortgage on said building; that at all times until the year 1961, the respondent recognized the rights in and to the said property and never held said property adversely to said complainant but treated said property as the joint property of the complainant and respondent.

The bill prayed that a resulting trust or a constructive trust be established in favor of the complainant to one-half interest in the apartment building.

The respondent's answer denied the material allegations of the bill and averred that title was taken in the name of the respondent; that the down payment on the property was paid with money which was the sole and exclusive property of the respondent who executed the notes and mortgage securing said notes for the balance of the purchase price; that the complainant did not contribute any money toward the down payment and was not bound or obligated to pay the balance or any portion of the balance of the purchase price, and that said balance was paid with money in which the complainant had no interest.

The answer further averred that the complainant and respondent had not ever mixed their separate property or money, but each kept his or her own money separate from that of the other; that there was no implied agreement that the parties would be joint owners of the apartment building.

The evidence introduced below tended to show that the complainant and respondent were married on 4 July 1940, and lived in Birmingham. Neither had assets at the time of their marriage though Mr. Cherpes was operating a small grocery store which went into bankruptcy a few months after the marriage. Shortly after this Mr. Cherpes secured a job as a salesman for a meat packing company, and Mrs. Cherpes secured work as a cashier in a restaurant.

During the Second World War, due to the shortage of meat products Mr. Cherpes' job as salesman for the packing company occupied very little of his time, though he still drew his salary of $25.00 per week. During this period Mrs. Cherpes' earnings were from $15.00 to $22.00 per week. Mrs. Cherpes testified that each week they brought their money home and put it together on a table, then she "always let him handle it and keep it for us." Mr. Cherpes testified that they always kept their money separately.

Mrs. Cherpes testified that during 1943, they had accumulated $900.00 and that she suggested that they enter into some sort of business and eventually suggested that they operate a boarding house. They did purchase a boarding house business in 1943. Mr. Cherpes handled the arrangements for the purchase and executed a mortgage to secure the balance, $500.00 being the down payment. A bill of sale to the furnishings in the purchased boarding house was executed to Mr. Cherpes, and he alone signed the lease to the building in which the boarding house was located. Everything in connection with this boarding house business such as to contracts for utilities, the insurance, the returns for withholding taxes, were made in the name of Mr. Cherpes.

Both parties worked in and around the boarding house, and by 1948, some additional boarding houses were acquired and operated by the Cherpes. Again, in each instance, the documentary evidence showed that the businesses were operated in the name of Mr. Cherpes.

By 1948, according to Mrs. Cherpes, they accumulated $10,000, this sum being the result of their joint labors in and around the boarding houses, though it was Mr. Cherpes' contention that the money was the result of his separate earnings.

There is a contradiction in the testimony as to the acquisition of the apartment house. Essie Mae Ellis, formerly Essie Mae Di-Giorgio, one of the grantors, testified that Mr. Cherpes came to see her on several occasions about purchasing the building and stated that he had learned that she was the owner from the courthouse records. She and Mr. Cherpes negotiated over the price of the building and during one conversation Mr. Cherpes stated that the money that would be used to purchase the apartment house was a joint savings of his wife and himself that they had accumulated by their joint labor. On the other hand, the testimony of Mr. Cherpes and H. K. Priest, a real estate agent, was to the effect that Mr. Priest negotiated the sale, and that he dealt with Mr. Cherpes and Mr. DiGiorgio solely.

In this regard it was Mrs. Cherpes' testimony that the $10,000 which they had accumulated had come from the operation of the boarding houses, that she and Mr. Cherpes discussed investing the money and "I had in mind getting an apartment and we collected the rent so my husband don't have to work." Mrs. Cherpes was familiar with the apartment house in question and told her husband to find out the owner, and "he came home and told me, 'I went to the courthouse and find out the owners of this apartment.'" She and Mr. Cherpes and Mrs. DiGiorgio went to the apartment and she advised her husband "it was just what we were looking for." After considerable negotiation they were offered the apartment for $38,000 with a down payment of $9,000. The apartments would bring in about $185.00 per month and after much discussion and calculation they decided to make the purchase.

Then one day her husband told her, "Well, today we are going to a lawyer's office. We are going to make the papers for the apartment." Mrs. Cherpes further testified:

"That is all I know. We went the same day to Mr. Bite's office * * * Mr. Bite told me 'Since the house is in your name, Mrs. Cherpes, let's put the apartment in Pete's name. Let's not have all eggs in one basket.' That is all he told me. I was so happy. I was joking with Mrs. DiGiorgio. I let the men take care of it * * *."

Mrs. Cherpes testified that she and Mr. Cherpes never had any discussion as to whom the deed to the apartment would be made but that she depended upon her husband for advice in all matters. When the deed was delivered the next day, she saw that the deed was in Mr. Cherpes' name but "it don't bother me, no." When she asked Mr. Cherpes, "What Mr. Bite says" (putting all eggs in one basket) "he says 'by law half is yours,' and then later on on a

few occasions like that, he was saying 'half is yours.' In fact, he mentioned it quite a few times that after his death, I be rich with it."

There was testimony from a number of witnesses, most of whom were members of the Greek community in Birmingham, that on various occasions Mr. Cherpes referred to the apartment building as being "our property," "we bought the property," and "we both worked together and we buy this property."

There was testimony to the effect that both Mr. and Mrs. Cherpes attended to the operation of the apartment building after it was purchased, though all rental contracts were made with Mr. Cherpes individually.

In his own behalf Mr. Cherpes' testimony was to the effect that during World War II when his job as a meat salesman took up only one to two hours per week of his time, he looked around for additional work. During this time he also worked for the Tip Top Grocery on the weekends.

He located a boarding house business for sale and over Mrs. Cherpes disapproval he bought the place. In the ensuing years he also bought the additional boarding houses.

Mr. Cherpes testified that he and his wife always kept their money separately, he keeping his money in a closet, and Mrs. Cherpes keeping hers in a drawer.

Mr. Cherpes denied that any of the money with which the first boarding house business was purchased belonged to Mrs. Cherpes. He further testified that in 1948, he operated six boarding houses, having quit working for the meat packing company in 1945. From the operation of these boarding houses he saved $9,000 though some of this money was from his salary with the meat packing company.

When he became interested in buying the apartment building, he engaged Mr. Priest as a real estate agent to negotiate the sale. Mr. Cherpes testified he never discussed the matter with Mrs. DiGiorgio, and never talked to her before the closing of the sale in Mr. Bite's office. He denied he ever told Mrs. DiGiorgio that his wife helped him make the money and that it was half hers.

Mr. Cherpes testified that the rental income produced by the apartment was insufficient to make the mortgage payments and to pay for the upkeep and improvements on the property. He put additional money into the operation and maintenance and the building did not make a profit until 1956, at which time he put $3,900 into the debt, said sum being the proceeds of a sale of property he had owned in Greece since prior to his marriage to Mrs. Cherpes.

It might be noted here that in Mr. Cherpes' bankruptcy proceedings he made sworn statements that he owned no property.

The record in this case is rather voluminous and in the interest of reasonable brevity, it would be impractical to set out all of the evidence in detail. What we have set out above does, we think, represent a fairly accurate picture as presented by the evidence, and is sufficient for this review.

Under appropriate assignments of error, counsel for appellant has argued several points and propositions which, it is contended, demonstrate the errors infecting the decree rendered below.

Firstly, counsel argues that where an alleged beneficiary furnishes money for a portion of the purchase price of real property, and *consents* that title to the property be taken in another, no constructive trust arises in favor of the alleged beneficiary.

■ Marriage raises between the husband and wife a relationship of confidence and trust, exacting the utmost good faith in dealings between them. Endsley v. Darring, 249 Ala. 381, 31 So.2d 317. Other than under the testimony of Mr. Cherpes, the evidence tends to amply show that the operation of the boarding houses was a joint effort, and that the money used to purchase

them was the property of both. The profits resulting therefrom were the fruits of their joint labors. Likewise, there is an abundance of testimony tending to show that Mrs. Cherpes participated actively in the management of the apartment house, and to show many statements by Mr. Cherpes that the apartment house was their joint property.

If, as Mr. Cherpes contends, the apartment house was purchased with his own individual funds, and over Mrs. Cherpes' strong objections, it is difficult to understand why Mrs. Cherpes was taken or invited to be present in the attorney's office at the closing of the purchase of the apartment.

 It is true that there was no discussion between the Cherpes as to how the grantees would be named in the deed, and she was told by the attorney that since the title to a house was in her, and in order not to put all eggs in one basket, Mr. Cherpes was named as grantee in the deed to the apartment house. We do not deem that under the facts as disclosed such must be considered as a consent by Mrs. Cherpes to a relinquishment of her right to share the monies which she testifies were the product of their joint labors.

As stated in Scott on Trusts, 2nd Ed., Vol. II, Section 216, at p. 1588:

"A distinction is to be drawn between consent of the beneficiary and a mere failure to object. The mere fact that the beneficiary knows that the trustee is committing a breach of trust and fails to make any objection is not sufficient to preclude him from holding the trustee liable for breach of trust."

Again, in Scott, supra, at Section 216.3, the following is set forth as the doctrine of the cases cited:

"Even if the beneficiary is sui juris, his consent will not preclude him from holding the trustee liable unless when he gave his consent he had knowledge of all relevant facts that the trustee knew or should have known and of his legal rights. Even if he does have such knowledge, he is not precluded if his consent was induced by improper conduct of the trustee. * * * The relation between the trustee and beneficiary being a fiduciary relation, the trustee must not in any way take advantage of his position. The parties are not dealing at arm's length and the trustee is bound to consider not only his own interest but that of the beneficiary as well."

If a portion of the money paid for the apartment house was shown to belong to Mrs. Cherpes, the fact that the deed was made to Mr. Cherpes would not prevent the establishment of a resulting trust. Sims v. Sims, 259 Ala. 296, 66 So.2d 445.

We hold that Mrs. Cherpes' silence did not amount to a consent under the factual circumstances of this case, and did not preclude her in her efforts to impose a trust on the apartment house.

Counsel in support of his contentions under this point, relies strongly on Talley v. Talley, 248 Ala. 84, 26 So.2d 586. In Talley, a brother and sister agreed to purchase a farm and to pay for the same by their joint labor. Both worked on the farm and used the income to pay the purchase price. However, the brother had made the down payment on the farm solely from his own money, the sister contributing nothing, and the deed was made to the brother. After the farm had been paid for the brother repudiated the verbal agreement made with his sister. It was held that no constructive trust could be imposed as it was the payment of the purchase money at the time the title is acquired that must be looked to, and at this time no portion of the down payment was from money of the sister. In the present case, under complainant's evidence, her money constituted a portion of the purchase prices of both the boarding houses and the apartment building. Such facts remove the present case from the influence of Talley.

Secondly, counsel for appellant argues that the court erred in decreeing a resulting trust in favor of Mrs. Cherpes in one half of the apartment building in that the evidence did not permit the court to ascertain with certainty what portion of the purchase price of said building was furnished by Mrs. Cherpes.

Counsel relies upon statements to be found in the opinions of this court, of which the following in Ryan v. Ryan, 267 Ala. 677, 104 So.2d 700, is representative:

"Where one party's money is used in payment of property and title is taken in the name of another, there is a presumption of a resulting trust in favor of the party whose money was used *to the extent of the [money] so used.* Lamar v. Lamar, 263 Ala. 391, 82 So.2d 558; Adams v. Griffin, 253 Ala. 371, 45 So. 2d 22; Wilson v. Wilson, 257 Ala. 135, 57 So.2d 519; Jacksonville Public Serv. Corp. v. Profile Cotton Mills, 236 Ala. 4, 180 So. 583, 4 Pomeroy, Equity Jurisprudence, §§ 1037, 1038." (Emphasis ours.)

It must be remembered that we are here dealing with the creation of a constructive trust.

In Summers v. Summers, 218 Ala. 420, 118 So. 912, it is stated:

"To create a constructive trust, 'actual fraud is not necessary; but such a trust will arise whenever the circumstances under which property was acquired make it inequitable that it should be retained by him who holds the legal title.' 39 Cyc. 169.

" 'One who acquires land or other property by fraud, misrepresentation, concealment, or under any other circumstances as render it inequitable for him to retain it, is, in equity, regarded as the trustee of the party who suffers by reason of the fraud or other wrong and who is equitably entitled to the property.' "

In Knowles v. Canant, 255 Ala. 331, 51 So.2d 355, we find the following observation:

"A constructive trust, or, as it frequently is called, a trust *ex maleficio* or *ex delicto*, arises, as Mr. Pomeroy says, 'Whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentation, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein; * * *.' "

In Longley v. Patton, 264 Ala. 235, 86 So.2d 820, we quoted with approval the following statement from Bogert, The Law of Trusts and Trustees, Vol. 3, Section 471:

"A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief."

This principle affords a court of equity wide powers to do what it thinks right and just. Particularly should this principle be applicable in dealings between husband and wife.

As stated in Bogert, supra, at Section 457, with citation of authorities:

"In several cases proof was made that land was bought from the pooled earnings of the members of a family who lived together and that the deed was made to one member of the household. Some courts have been strict in requiring proof from a resulting trust claimant in such cases that he paid a definite sum toward the price, but in other cases the lack of bookkeeping records and the equities of the situation have led the courts to presume equal

contributions or in other ways to justify the giving of relief."

Certainly in considering a constructive trust the latter view is more appealing.

Perhaps the clearest statement of the principle is to be found in Adams v. Adams, 40 Hawaii 593, as follows:

"The chancellor found that the petitioner's contributions were of substantial amounts earned by her through outside employment as well as sewing and that the contributions were made on the purchase price of the property based upon the belief that she was purchasing property for herself jointly with her husband.

"Though no accurate account was kept of the amounts contributed by the wife (nor, for that matter, by the husband) it is clear that the understanding of both parties was that this was a joint arrangement whereby the purchase price was to be paid out of the pooled earnings of both or a 'common pot.'

"While appellant admits that where contributions are shown by a wife in the purchase of property there is no presumption of a gift, yet he contends that for a trust to result from such payments by one when title is taken in another there must be clear and convincing evidence of the amount contributed if the trust interest is to be created in the property.

"While the general rule may well be stated by counsel for appellant, the situation where family ties are concerned is quite different and more particularly so where the parties involved are husband and wife. (Koehler v. Koehler, 75 Ind. App. 510, 121 N.E. 450; Fox v. Maurer et al., 178 Ore. 64, 164 P. [2d] 417; Hughes v. Helzer, 182 Ore. 205, 185 P. [2d] 537.)

"The relation of husband and wife is a status calling for the utmost confidence of each in the other. Under such an arrangement there should be no need for keeping books of account or for a lawyer, or rather for two lawyers, in dealing with the other; they are not dealing at arm's length; the love, affection and welfare of the family are sufficient considerations to offset any inequality in the contributions where an arrangement is entered into for the purchase of a home jointly. That the evidence fails to indicate the specific part of the purchase price of the property which the wife may have made or the fractional interest which the wife may have made or the fractional interest which she should have is not fatal to the trust as the entire arrangement shows each expected equal shares in the property; in fact, it was doubtful if the wife, with her limited education and business experience, would know anything about the technicalities of joint deeds or conveyances as tenants in common, etc.
* * * *"

To like effect see also King v. King (Fla. Dist.Ct. of Appeals, Second Dist.) 113 So. 2d 242; Stewart v. Bowen, 224 Ark. 275, 273 S.W.2d 540; Scanlon v. Scanlon, 6 Ill. 2d 224, 127 N.E.2d 435; Shoemaker v. Smith, 11 Hump. (Tenn.) 81; Lowell v. Lowell, 185 Iowa 508, 170 N.W. 811; Rimmer v. Rimmer, [1953] 1 Q.B. 63.

The evidence presented by Mrs. Cherpes tends to show that the original boarding house was purchased by commingled funds of her own and Mr. Cherpes, and that substantially half of the down payment was Mrs. Cherpes'. Thereafter, upon the acquisition of additional boarding houses, the profits therefrom resulting from the joint labors of the Cherpes', were used in making the down payment on the apartment house. Both parties participated in the work of operating the apartment building. Both parties by their joint efforts saved money for the enterprises which was intended to provide for their old age. We think the lower court was amply justified under the evidence in concluding that the presumption should be that the beneficial interest in the apartment house was equally in both.

**354**

Thirdly, counsel for appellant argue that the chancellor erred in the decree entered in that to support the establishment of a trust by a court the evidence must be clear, strong, unmistakable, and unequivocal. Such is the rule in that to engraft a trust upon a deed such result contradicts the presumption that the deed speaks the whole truth until the contrary is established beyond reasonable controversy. Banks v. Banks, 253 Ala. 252, 44 So.2d 10; Sims v. Sims, 259 Ala. 296, 66 So.2d 445.

There was of course an irreconcilable conflict between the evidence presented by the complainant and that presented by the respondent. Such contradiction was solely for resolution by the chancellor below, before whom the evidence was heard ore tenus. It is of course elemental that under such conditions his conclusions will not be disturbed unless palpably erroneous.

The evidence presented by the complainant was, in our opinion, sufficient to the degree of proof required to support the decree rendered.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.