These appeals are from a judgment, made final by entry of a Rule 54 (b), ARCP, order, declaring and imposing a constructive trust on funds accrued to defendants-employers' Salaried Employees Incentive Bonus Plan in favor of the plaintiffs-employees. We affirm
Pollution Control-Walther, Inc. (PCW) was organized in 1972 to design, fabricate, and construct precipitators for removing pollutants from smoke and furnace discharges. In January of 1976, PCW posted written notice to its salaried employees of a Salaried Employees Incentive Bonus Plan (the Bonus Plan). The notice stated the terms of the plan in four typewritten pages. It stated that PCW recognized that it "benefits materially from the efforts of its salaried employees and recognizes its need for an incentive to stimulate continued growth [of the company]. . . ." The objective stated was "to make the best place to work and the maximum profits from every opportunity."
For "each project closed during the accounting year" an independent certified public accounting firm was to make a statement of profit and submit it to the Executive Committee (of the Board of Directors of the employer). The Bonus Plan detailed the schedule and procedure by which that committee would determine the bonus and gave, as an example, a schedule of profit percentage to be contributed to the bonus fund monies derived from the TVA Widows Creek project, which project began in 1974 and was declared to be the first project subject to the Bonus Plan
The Bonus Plan description ended, however, with the following qualifications:
 Based on the development of the incentive bonus fund, distribution will be made in a discretionary manner based on salaries, job assignment, and performance with regard to the project concerned. No employee, participant, or other person shall have any claim or right to be granted an award under this plan
. . .
 This plan shall be administered by the Executive Committee which shall have full power and authority to interpret, construe and administer this plan and any part thereof and the Compensation Committee's interpretation and constructions thereof, and actions thereunder, shall be binding and conclusive on all persons for all purposes *Page 374 
 This plan may be amended, suspended, terminated or reinstated in whole or part by the Executive Committee
In March 1976 PCW began crediting an "accrued bonuses" account and correspondingly debiting a "bonus expense" account
On 18 April 1977, PCW sold its assets to Combustion Engineering, Inc., which operated C-E Walther, Inc. (CEW) as a wholly-owned subsidiary. CEW assumed all rights and duties of PCW and continued to post credits to the accrued bonuses account That account stood at $458,000 as of the asset transfer; until 25 October 1977, when the Executive Committee of CEW voted to terminate the Bonus Plan, the accrued bonus account stood at $597,000. It was then debited, as of 31 December 1977, to a zero balance with two offsetting credits, one against the bonus expense account in the amount of $139,000 accrued under CEW, and the other against a "license account" in the amount of $458,000 accrued under PCW. No bonuses had ever been paid under the Plan
On 15 February 1978, Louis Belzer and sixteen other salaried employees of PCW filed an action seeking a declaration that PCW, its successors and assigns, held the funds in the Bonus Plan in trust for the benefit of the plaintiffs and all other persons in an asserted class. The trial court, after a determination hearing, declined to certify the claims as a class action but allowed a large number of other individuals to join the action as plaintiffs. CEW was later added as a defendant; the plaintiffs also added counts sounding in contract, fraud, for work and labor done, and conversion, but the equitable claim regarding the constructive trust was the only one tried and the subject of the Rule 54 (b) judgment from which this appeal is taken
PCW and CEW defended, and this appeal focuses chiefly, on the grounds that the conditions set out in the Bonus Plan had not been satisfied and the entries in the accrued bonuses account do not represent a segregated fund that could constitute a trustres. Regarding the first contention, the main thrust of the argument is that none of the projects in question had been completed and the Executive Committee had never exercised its discretionary functions by establishing a bonus factor and approving bonus payments to individual employees
Upon consideration of the record in its entirety, we find no merit in the companies' contentions but, to the contrary, an ample basis upon which to affirm the trial court's judgment favorable to the employees
There is sufficient evidence of record that the employees relied upon the Bonus Plan. As an example, Rodney Lewis testified he was told during his interview for a job at PCW that the Bonus Plan was offered in lieu of a retirement plan, and at a point in time after he came to work for PCW the manager of projects told him he had accumulated three thousand dollars under the Plan Peter Meredith, hired as administrative manager in 1973, testified he was told in late 1974 that a bonus plan would be offered as an incentive for employees to work hard for the salary they were being paid to make the company successful. Further, that he was told to point out the Bonus Plan during hiring interviews, that he was denied a raise but told that "once we all participated in this plan, we would all receive money that would overcompensate us for our hard times now."
PCW made other assurances to its salaried employees that sums were accumulating in the Bonus Plan which would be paid out when contracts were completed. Numerous employees talked to those employed in the accounting department, and the Vice-President for Finance, and were told generally or specifically that money would be coming to them because of the Plan. The Proxy Statement issued by PCW in March 1977 included a note that a percentage of income before taxes, realized on certain contracts completed during the fiscal year, would be set aside in a fund for distribution to participants; the amount through 31 March 1976 being $121,000, and for the following nine months, $206,000. These sums plus the $131,000 accrued in the first three months of 1977 constituted the $458,000 *Page 375 
upon which the trust was imposed by the trial court. Furthermore, bookkeeping entries specifying bonuses accrued to individual employees were begun under the plan and completed, by order of the trial court, after entry of the judgment establishing the trust
PCW and CEW argue that no bonuses were due under the Plan because the projects were not completed when CEW terminated the Plan in November of 1977. The project managers for each project testified, however, that each job had been invoiced, paid, and in some cases, put on stream by the customer before this date. Most of the contracts were not closed because testing remained to be done; while this could perhaps be construed as "incomplete" under the Plan itself, under the evidence the court below could properly find that the jobs were substantially complete. The employees had done the work motivated by the Plan and CEW had arbitrarily cancelled the plan as to projects that had been performed under the Plan incentive
We have no trouble disposing of the argument made by PCW and CEW that there was no trust res. In support of this contention, they rely on the decision of this court in Ex parte Morton,261 Ala. 581, 75 So.2d 500 (1954), for the proposition that the accounting records do not represent a fund upon which the court may impose and establish a trust. In that case, this court held a constructive trust could not be imposed upon credit extended by a bank to other parties. The facts here differ: PCW's accounting records corresponded to actual funds received from its customers It cannot rely on the fact that it failed to segregate funds in a separate account, which it represented it would do. There were indeed funds coming in; witnesses testified that invoices had been paid. In fact, the "Gross Margin" (roughly corresponding to profit) realized on the eight projects in question, more than doubled: from nearly four million dollars in the original budgets to well over eight million dollars in the estimated final budget
Under these and other facts developed below, the trial court's judgment declaring and imposing a constructive trust should and must be allowed to stand
. . . A constructive trust is a creature of equity which operates to prevent unjust enrichment. A constructive trust will be found when property has been either acquired by fraud, or where in the absence of fraud it would not be equitable to allow it to be retained by him who holds it. Sims v Reinert, 285 Ala. 658, 235 So.2d 802 (1970); Putnam v. Putnam, 274 Ala. 472, 150 So.2d 209 (1963). The issue of whether or not a constructive trust results is one of fact and as stated previously where the evidence is heard ore tenus the trial court's finding of fact will not be disturbed unless it is clearly erroneous or manifestly unjust. . .
In re Estate of Moore, 349 So.2d 1107, 1108 (Ala. 1977). See alsoCherpes v. Cherpes, 279 Ala. 346, 185 So.2d 137 (1966)
The judgment may be enforced against CEW because it assumed PCW's liabilities with full knowledge of the Bonus Plan accruals The trial court did not, however, award the $139,000 which accrued to the plan under CEW. Because the order does not mention this sum and the employees cross-appeal from the denial thereof, we must remand for consideration of this issue. If the trial court finds that CEW effectively undertook to continue the Bonus Plan established by PCW, the trust fund should be increased appropriately. If, on the other hand, the trial court does not find that equity dictates enforcement of the trust for the period of CEW's management, the relief granted in the prior order is all to which plaintiffs are entitled
Accordingly, the judgment below is due to be affirmed in part and reversed and remanded in part for further proceedings in conformity with this opinion
AFFIRMED AS TO THE APPEAL, REVERSED AS TO THE CROSS-APPEAL AND REMANDED
FAULKNER, MADDOX, JONES, ALMON, SHORES, BEATTY, and ADAMS, JJ., concur
TORBERT, C.J., dissents *Page 376